904 F.2d 853
 56 Fair Empl.Prac.Cas. 483,
53 Empl. Prac. Dec. P 40,002
Dorothy DRINKWATER, Appellant,
v.
UNION CARBIDE CORPORATION, Henry Kahwaty, National Marketing
Services Manager, in his individual and representative
capacity; and H.V. Pratt, Jr., Director-Distributor
Marketing, in his individual and representative capacities.
 No. 89-5418.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 18, 1989.
Decided June 6, 1990.
 
 Philip Rosenbach (argued), Rosenbach and Rosenbach, Livingston, N.J., for appellant.
 Robert J. Hrebek (argued), Sea Girt, N.J., for appellee, Henry Kahwaty.
 Theresa Donahue Egler (argued), Edward P. Lynch, Pitney, Hardin, Kipp and Szuch, Morristown, N.J. (John B. Day, Union Carbide Corp., of counsel), for appellees, Union Carbide Corp. and H.V. Pratt, Jr.
 Before BECKER, COWEN and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is an appeal by plaintiff Dorothy Drinkwater from the grant of summary judgment in favor of the defendants, Union Carbide Corporation (UC), and its employees, Henry Kahwaty and H.V. Pratt, Jr., in a diversity case based on New Jersey law. Plaintiff charges gender-based employment discrimination and retaliatory discharge. Plaintiff's discrimination claim alleges that her conditions of employment were impermissibly harmed by the open sexual relationship, between her supervisor and one of her co-workers, which created a hostile and sexually-charged work environment from which she suffered because of her sex. Plaintiff's retaliation claim alleges that whether or not her discrimination claim survives, she had a reasonable belief that UC had created a discriminatory hostile work environment, and that UC retaliated against her for complaining about that environment.
 
 
 2
 For the reasons that follow, we will affirm the grant of summary judgment on the sex discrimination claim, but will reverse on the retaliation claim and remand for further proceedings.
 
 I. THE RELEVANT FACTS OF RECORD[1]
 
 3
 Plaintiff first went to work for UC after graduating from Smith College in 1974. During the course of her employment, she worked in Alabama, Louisiana, South Plainfield, New Jersey, and again in Alabama, where she managed a market analysis group for UC's Southern Region. In 1984, she was offered a research planning position with a UC market research group in Somerset, New Jersey. The Somerset group was organized by and operated under the supervision of defendant, Henry Kahwaty. The manager of the group was Hank Robinson, to whom plaintiff reported. Plaintiff herself supervised a number of marketing specialists, including Donna Schembri, who was hired at Kahwaty's suggestion, over the objection of Robinson. Kahwaty himself reported to Sam Bramande.
 
 
 4
 When Kahwaty offered plaintiff the Somerset job, he promised her several benefits. Among other things, plaintiff was told that she could hire a market researcher and that she would not receive a job performance evaluation of "5," which denotes that there is too little information to evaluate the employee.[2] In accepting the position, plaintiff also relied on the UC policy that provided transferring employees with differential mortgage adjustment payments and cost-of-living reimbursements.
 
 
 5
 Shortly after she arrived in Somerset, plaintiff encountered difficulties with the mortgage differential payment.[3] She also encountered a problem with her interim hotel arrangements.[4] However, the crux of plaintiff's claim involves the effect of the sexual relationship between Kahwaty, plaintiff's supervisor, and Schembri, plaintiff's subordinate and Kahwaty's protege, upon the work environment (and hence upon plaintiff).
 
 
 6
 Both Kahwaty and Schembri demonstrated frequent unprofessional behavior. Schembri disregarded office hours, plagiarized the work of other employees, attended staff meetings outside of her area of employment, and tried to enlist plaintiff and fellow telemarketing specialist Yvonne Noyes in an attempt to have Robinson removed as head of the Somerset group. Kahwaty reassigned work from Schembri to plaintiff and never allowed plaintiff to hire the assistant that he had promised her. Moreover, Kahwaty called Schembri frequently and often fraternized with her in an unprofessional manner.
 
 
 7
 Various employees complained frequently about Schembri. Plaintiff brought these and her own complaints to Robinson's attention, but Robinson did nothing. By October of 1984, Kahwaty became aware of plaintiff's complaints. At that point, he began expressing concerns about the quality of plaintiff's work. His concerns included placing a note in his files saying that plaintiff was "very tired--almost sleepy" at a staff meeting. In August of 1984, Kahwaty asked plaintiff to sign a non-disclosure statement regarding a sexual harassment complaint filed by a previous employee, Barbara Hageman. The statement threatened any signatory who spoke about the Hageman incident with immediate discharge. Plaintiff was reluctant to sign the statement because she had accepted some of Hageman's duties. The day after the staff meeting at which he noted that plaintiff was "sleepy," Kahwaty telephoned plaintiff and asked her about the non-disclosure statement. Plaintiff expressed her concerns about signing the statement and suggested to Kahwaty that she might go to the employee relations department to talk about it. Kahwaty told her not to go.
 
 
 8
 Shortly after this incident, plaintiff again spoke with Robinson about her difficulties. Robinson warned plaintiff that her career might be in jeopardy if Kahwaty was starting to put disparaging notes in her file. Plaintiff therefore turned to the Employee Relations Department and on October 16, 1984, she met with Patricia Austin. Prior to the actual meeting, plaintiff expressed to Austin her reservations about talking because she was worried about retaliation by Kahwaty. Austin assured plaintiff that retaliation was not tolerated by the company and was against the law. At their meeting, Austin told plaintiff that the UC management group had had difficulty with female employees and that Kahwaty and Schembri had been investigated previously in connection with the Hageman case.
 
 
 9
 Austin conducted an investigation and met with plaintiff again on November 13, 1984. At that time, Austin told plaintiff that the refusal to sign the Hageman non-disclosure statement was an act of insubordination, although Austin refused to disclose the contents of the statement. Austin added that plaintiff had made unfounded accusations and that she would be disciplined if she continued to accuse her superiors of improper conduct.
 
 
 10
 Kahwaty continued to afford Schembri preferential treatment. In early December 1984, plaintiff discovered that Schembri was using an automobile leased by UC's competitor, M.G. Burdette. This was a clear violation of company policy and plaintiff reported it to Robinson. Plaintiff also learned that Kahwaty and Schembri had purchased two condominiums and were planning to live in them together.
 
 
 11
 At some point in December, Robinson told plaintiff that she would receive a "2" or a "3A" (which is higher than a 3) on her performance evaluation. This was later changed to a "5," contrary to what she had been promised when she accepted the Somerset job. Robinson acknowledged that Kahwaty played a crucial role in amending the performance ratings. Apparently, Kahwaty ordered that everyone in the group should receive a "5" in order to ensure that Schembri would not be evaluated negatively.
 
 
 12
 In January of 1985, Kahwaty summoned plaintiff to a meeting. Kahwaty started the meeting by remarking about plaintiff's dress, eyeshadow and makeup. He suggested that plaintiff be more willing to correct misperceptions about her performance, which he proceeded to criticize extensively. Kahwaty concluded the meeting by stating that an amicable relationship with Schembri would henceforth be a performance criterion for plaintiff's job.
 
 
 13
 Shortly after her January meeting with Kahwaty, plaintiff received two notes from Robinson instructing her to reimburse UC for the difference in hotel rates. At this point, plaintiff decided to retain an attorney to help her respond to what she felt was continuing harassment. On January 18, 1985, attorney Shelley Kostrinsky wrote to UC demanding that UC "cease and desist from any further discriminatory practices." App. at 81. The letter also stated that Kostrinsky's firm had reviewed and examined the case and had satisfied itself that, "at a minimum, the facts spell out a case of discriminatory treatment based on Ms. Drinkwater's sex." Id.
 
 
 14
 Later in January, plaintiff spoke with an investigator for UC's Internal Audit Department ("IAD"). IAD then conducted its own inquiry and discovered several of the improprieties mentioned above. As a result of the official inquiry, Kahwaty was placed on probation and transferred to UC's corporate headquarters in Danbury, Connecticut. Schembri was transferred from Somerset to Moorestown, New Jersey. Defendant Pratt replaced Kahwaty. However, UC did not make known the reason for the personnel change. Bramande (Kahwaty's supervisor) told the Somerset group that Kahwaty's other responsibilities prevented him from continuing to supervise the group. He made no mention of disciplinary proceedings, so that plaintiff had no way of knowing that UC had acted on her complaints. Concerned about how much control Kahwaty might still have, plaintiff related her past problems to her new supervisors. She was assured that Kahwaty would not maintain his supervision of the Somerset group.
 
 
 15
 Unfortunately for plaintiff, the change in personnel did not bring her much relief. Pratt made disparaging remarks about plaintiff from the start, and he turned a deaf ear to plaintiff's problems with Kahwaty and Schembri. Pratt expressed sympathy for Kahwaty, told plaintiff to stop talking about the past, and instructed plaintiff to prevent Noyes from talking about Kahwaty and Schembri. Pratt refused to apologize for the treatment plaintiff had received and accused her of being overly sensitive. There is also evidence that Kahwaty continued to control the activities of the Somerset group from Danbury.[5] Pratt told plaintiff that at a recent staff meeting Kahwaty had stated that plaintiff was "senile." Pratt also refused to assist plaintiff in obtaining the mortgage differential that she had been owed for several months.
 
 
 16
 On July 23, 1985, Pratt told plaintiff that the Somerset group was being dissolved, and that UC would transfer her to a position at the same grade and salary level in Danbury. UC maintained that this was a good opportunity for plaintiff because Danbury was the corporate headquarters. Plaintiff was quite hesitant, however, because the new job did not have a managerial title and did not involve supervisory duties. Furthermore, the Danbury job would have required her to work, once again, with both Kahwaty and Bramande. At this point, plaintiff still had not been told that Kahwaty had been disciplined, and she therefore had no reason to believe that his mistreatment of her might abate.
 
 
 17
 Plaintiff expressed her concerns to Pratt and asked for some time to consider the offer. On August 5, 1985, less than two weeks after Pratt told plaintiff that the Somerset operation was dissolving, Pratt wrote to her (while she was on vacation) and told her that if she did not accept the Danbury offer within four days, she would be deemed a voluntary quit. Plaintiff responded immediately, saying that she did not want to accept the Danbury job because she considered it to be an inferior position. As far as she could tell, the Somerset group had simply been moved to Danbury, and the position UC was offering could be construed as nothing other than a job with the same group of people, but with less responsibility. She emphasized that she was not, after 11 years of service to UC, quitting voluntarily. Pratt responded on August 14, 1985, wishing plaintiff "continued success in [her] future career endeavors." App. at 110. Two other members of the Somerset group, Robinson and telemarketing specialist Paul Madden, both male, were retained by UC. Yvonne Noyes was laid off.
 
 II. PROCEDURAL HISTORY
 
 18
 On December 4, 1984, plaintiff filed a nine-count complaint in the New Jersey Superior Court against UC, Kahwaty and Pratt.[6] The complaint sought relief for defendants' alleged violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq., the New Jersey Constitution, and New Jersey tort law. Count one alleged that UC paid plaintiff less because of her sex. Count two alleged that plaintiff was adversely affected, in violation of the NJLAD, by Kahwaty's personal relationship with Schembri. Count three alleged that plaintiff was retaliated against, and ultimately terminated, because she openly opposed discriminatory activity at UC. Count four alleged New Jersey constitutional violations based on the same facts as counts two and three. Counts five through seven alleged, respectively, wrongful discharge, false and defamatory statements, and intentional infliction of emotional distress. Count eight alleged contractual violations by UC with regard to plaintiff's severance payments. Count nine alleged interference with economic advantage.
 
 
 19
 Defendants removed the case to the district court for the District of New Jersey. They then filed answers to plaintiff's complaint and moved for summary judgment. Plaintiff responded with affidavits. Thereafter, plaintiff withdrew counts seven and nine. The district court referred the remaining counts to a United States Magistrate, whose Report and Recommendation was adopted by the district court on May 27, 1987. Pursuant to that report, the district court granted summary judgment for UC on counts one, two and six and denied summary judgment on counts three, four, five and eight. On January 25, 1989, defendants again moved for summary judgment and on April 19, 1989, the district court granted summary judgment for defendants on all remaining counts. Plaintiff timely appealed from the April 19, 1989 order. Before this court, plaintiff has argued for reversal on counts two, three, four, five and eight.
 
 III. THE SEX DISCRIMINATION CLAIM
 A. Jurisdiction
 
 20
 Because of an alleged deficiency in the notice of appeal, we must decide preliminarily whether we have jurisdiction to review plaintiff's sex discrimination claim (count two). Plaintiff alleged that her "conditions and privileges of employment were adversely affected ... in violation of N.J.S.A. 10:5-1 et seq." App. at 3. Count two was dismissed by the district court in the May 27, 1987 order adopting the recommendations of the magistrate. The notice of appeal reads as follows: "Please take notice that plaintiff hereby appeals from those portions of the order filed April 19, 1989 granting summary judgment to the defendants and dismissing the complaint." App. at 274. It does not mention the May 1987 order.
 
 
 21
 Federal Rule of Appellate Procedure 3(c) states that "[t]he notice of appeal shall ... designate the judgment, order or part thereof appealed from." Relying, inter alia, on Elfman Motors, Inc. v. Chrysler Corp., 567 F.2d 1252, 1254 (3d Cir.1977), defendants argue that we cannot review the district court's decision to dismiss count two because "[w]hen an appeal is taken from a specified judgment only or from a part of a specified judgment, the court of appeals acquires thereby no jurisdiction to review other judgments or portions thereof not so specified or otherwise fairly to be inferred from the notice as intended to be presented for review on the appeal." Id. at 1254. Defendants argue that the Elfman standard is not met. We disagree.
 
 
 22
 Our jurisprudence liberally construes notices of appeal. See, e.g., Bello v. Walker, 840 F.2d 1124, 1131 (3d Cir.1988), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). See also Foman v. Davis, 371 U.S. 178, 181-82, 83 S.Ct. 227, 229-30, 9 L.Ed.2d 222 (1986). Plaintiff's notice appeals from the order "dismissing the complaint," which we read to mean the complaint in its entirety, thus potentially including those counts of the complaint dismissed in the (earlier) May 27, 1987 order. In Elfman, we noted that "since ... only a final judgment or order is appealable, the appeal from a final judgment draws in question all prior non-final orders and rulings." 567 F.2d at 1253. "[I]f ... it appears that the appeal was intended to have been taken from an unspecified judgment order or part thereof, the notice may be construed as bringing up the unspecified order for review." Id. at 1254.[7] Clearly, in this case, the finality doctrine barred plaintiff from appealing the count two dismissal until the district court filed the April 1989 order. See also Gooding v. Warner-Lambert Co., 744 F.2d 354, 357 n. 4 (3d Cir.1984); Murray v. Commercial Union Insurance Co., 782 F.2d 432, 434-35 (3d Cir.1986); Williams v. Guzzardi & Chancellor Associates, 875 F.2d 46, 49 (3d Cir.1989). Thus, the precepts of Elfman are satisfied.
 
 
 23
 Furthermore, even though the court had previously dismissed count two, its April 1989 opinion granting summary judgment on the retaliation claim included a six-page discussion of the merits of count two, the discrimination claim. In all likelihood, the court felt that this explication was necessary because, as will be demonstrated infra, the discrimination claim is inextricably meshed with the retaliation claim. Indeed, it is impossible to decide the retaliation claim without making some assessment of the merits of the discrimination claim. Similarly, the constitutional claim, count four, is based in part on the theories subsumed in count two. The constitutional claim was not dismissed until April 19, 1989. Hence, count two may be incorporated into the April 19 order by reference. These factors further support our decision to review the discrimination claim.
 
 
 24
 Finally, because defendants addressed the discrimination claim in addressing the retaliation claim, our decision to review does not prejudice them. We therefore conclude that we have jurisdiction to review the discrimination claim.[8]
 
 B. The Merits
 
 25
 Plaintiff's papers are less than clear in delineating the nature of her sex discrimination claim. However, we read her papers as advancing a hostile environment sexual harassment claim based on the workplace environment created by the relationship between Kahwaty and Schembri.[9] Plaintiff alleges that the environment was "oppressive and intolerable," and she asserts that "a female should [not have to] suffer because a male supervisor is sexually attracted to another woman to the point where it interferes with the workplace." Brief for Appellant at 46. This assertion finds support in the EEOC Sexual Harassment Guidelines:
 
 
 26
 [V]erbal or physical conduct of a sexual nature constitute[s] sexual harassment when ... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.
 
 29 C.F.R. Sec. 1604.11(a).[10]
 
 27
 The case law addressing sexually discriminatory hostile work environment situations, as described in the Guidelines, is steadily developing.[11] However, the case law dealing with the kind of situation alleged here, where the relevant facts involve a sexual relationship between a supervisor and a co-worker, not the plaintiff herself, is still relatively sparse,[12] and we have been able to find only one case that involves, as does this case, an allegedly hostile environment created by a sexual relationship between a supervisor and a co-worker.[13]
 
 
 28
 Oppressive and hostile environments, whether they be infected with racial or sexual hostility, give rise to harassment claims on the theory that a discriminatory environment is a term or condition of employment.[14] This court has recently laid down the elements necessary to make out a hostile environment sexual harassment claim: "(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Andrews and Conn v. City of Philadelphia, 895 F.2d at 1482. Although we recognize that New Jersey might not apply this exact test (we have no guidance from the New Jersey Supreme Court), we believe that the Andrews test is sound and that New Jersey will adopt something akin to it; Hence we will apply Andrews here.
 
 
 29
 Before applying the Andrews test, we must address the threshold question whether a consensual romantic relationship can give rise to a claim like the one plaintiff presses here. The seminal cases dealing with consensual romantic relationships (although not hostile environments) have reached essentially different results. King v. Palmer, 598 F.Supp. 65 (D.D.C.1984), rev'd on other grounds, 778 F.2d 878 (D.C.Cir.1985), held that a plaintiff makes out a prima facie case of sex discrimination by offering proof that a woman who was promoted to a job in the plaintiff's stead was having a sexual relationship with a person partially responsible for the hiring decision. The D.C. Circuit assumed (without deciding) that the district court's prima facie formulation was correct and went on to reverse on other grounds. In contrast, the Second Circuit, in DeCintio v. Westchester County Medical Center, 807 F.2d 304 (2d Cir.1986), affirmed a grant of summary judgment for the defendant hospital against a class of male plaintiffs who alleged that the supervisor in charge of hiring for a particular position made National Board registration a prerequisite for the job in question as a way of ensuring that the supervisor's girlfriend was the only qualified applicant for the job. " '[S]ex,' when read in [the context of Title VII] logically could only refer to membership in a class delineated by gender.... The proscribed differentiation under Title VII, therefore, must be a distinction based on a person's sex, not on his or her sexual affiliations." Id. at 306-07.
 
 
 30
 The DeCintio decision was recently endorsed by the New Jersey Supreme Court in Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 569 A.2d 793 (1990). Erickson, is, of course, binding on this court sitting in diversity. In Erickson, a male plaintiff claimed that he had been wrongfully discharged and discriminated against on the basis of sex when his superior fired him in order to promote a woman with whom the superior had allegedly been romantically involved. More specifically, he claimed that "he was falsely accused of sexual harassment so that his superior's alleged girlfriend could be promoted to his position." 117 N.J. at 555, 569 A.2d at 801.
 
 
 31
 The New Jersey Supreme Court rejected Erickson's sex discrimination claim, first finding that he had not made out a prima facie case because he had not shown that the defendant was "the unusual employer who discriminates against the majority." Id. at 552, 569 A.2d at 800. Additionally, the court felt that "[Erickson's] allegations require[d] [them] to examine sexual harassment in the context of his [NJ]LAD claim." Id. at 555, 569 A.2d at 801. The court held that "[t]o be a valid third-party allegation of sexual harassment, [a] claim requires proof of coercion by [a supervisor] against [a co-worker]." In this context, the court found "no reason to extend the protection of [NJ]LAD to sex-discrimination claims based on voluntary personal relations." Id. at 557, 569 A.2d at 802.
 
 
 32
 Defendants' counsel have urged that Erickson controls this case and effectively eviscerates any colorable claim that plaintiff may have had. We disagree. If Erickson eliminates all hostile environment sexual harassment claims that involve consensual relations, we will need a clearer statement from the New Jersey Supreme Court to so conclude. For present purposes, we assume that, as the Erickson court noted, quoting from the earlier Superior Court decision, "the 'critical issue in [Erickson ] was not sexual harassment, but intentional sex discrimination.' " Id. at 555, 569 A.2d at 801 (quoting Erickson v. Marsh & McLennan, 227 N.J.Super. 78, 89 n. 3, 545 A.2d 812 (1988)). Erickson held that a consensual relationship cannot form the basis of a sex discrimination claim not founded on sexual harassment, and that a consensual relationship cannot, by itself, without additional evidence of sexual hostility, give rise to a hostile environment sexual harassment claim. However, before reading too much into Erickson we think it is important to emphasize that it was a very different case than the one at bar. Mr. Erickson was a male accused of sexual harassment, not a female accusing her employer of sexual harassment. The court carefully noted that Erickson was not a sexual harassment case. Id. More importantly, there was absolutely no allegation in Erickson that the atmosphere in the workplace was oppressive in a way that discriminated against Mr. Erickson as a man.
 
 
 33
 This case is distinguishable. Plaintiff has alleged a sexual harassment claim, not just a sex discrimination claim. To the extent that plaintiff argues that the Kahwaty/Schembri relationship gives her a cause of action for non-harassment sex discrimination, or that it, by itself, gives her a cause of action for sexual harassment, Erickson clearly defeats her argument. Plaintiff has attempted to allege more, however. Unlike Erickson, she alleged an "oppressive and intolerable environment," which, she argues, was created by the Kahwaty/Schembri affair. And there are at least hints in this record that the environment was so charged with sexual innuendo as to create an atmosphere that discriminated against her as a woman. We believe that there is a critical difference between this kind of hostile environment claim and the harassment claims pled in cases like Erickson: in hostile environment cases, it is the environment, not the relationship, that is actionable. The relationship may contribute to the environment, but it is the workplace atmosphere that is critical. Thus, we predict that the Supreme Court of New Jersey would distinguish Erickson and recognize hostile environment claims.[15]
 
 
 34
 In fact, however, this plaintiff's sexual harassment claim cannot survive. Although she makes remote references to the effect that the Kahwaty/Schembri affair had on the environment at UC, there is insufficient evidence in the record for plaintiff to survive summary judgment on that count. She alleges that the environment was "oppressive and intolerable" and that the relationship "interfered with the workplace," but she cannot survive summary judgment on these allegations alone. If plaintiff felt that Kahwaty's and Schembri's sexual conduct rendered the workplace a sexually charged environment, and that she suffered discrimination because of that environment, then she must make a showing to that effect.
 
 
 35
 Such an atmosphere might have discriminated against plaintiff if sexual discourse displaced standard business procedure in a way that prevented plaintiff from working in an environment in which she could be evaluated on grounds other than her sexuality. Thus, we believe that evidence of a sufficiently oppressive environment could, in theory, give courts enough evidence to infer that the intentional discrimination prong of the Andrews test can be met even absent evidence of the harasser's subjective intent to discriminate. However, there is no evidence that Kahwaty and Schembri flaunted the romantic nature of their relationship, nor is there evidence that these kinds of relationships were prevalent at UC. Cf. Broderick v. Ruder, supra.[16]
 
 
 36
 Plaintiff apparently wants us to assume that the atmosphere was sexually charged or that Kahwaty was making implicit sexual demands on her. We decline to make such assumptions.[17] A sexual relationship between a supervisor and a co-employee could adversely affect the workplace without creating a hostile sexual environment. A supervisor could show favoritism that, although unfair and unprofessional, would not necessarily instill the workplace with oppressive sexual accentuation. The boss could treat everyone but his or her paramour badly and all of the subordinates, save the paramour, might be affected in the same way. Erickson clearly states that this kind of situation does not create a claim for sexual harassment.
 
 
 37
 Finally, there are only two pieces of evidence in all of the record that indicate that Kahwaty was making stereotyped and impermissible demands on women. At paragraph 7 of her affidavit, plaintiff claims that Kahwaty hired Schembri because "nice looking women have a tough time making it in business."[18] And at paragraph 24, she alleges that Kahwaty started off their January 1985 meeting, most of which he spent reprimanding plaintiff and praising Schembri, with comments about plaintiff's makeup, eyeshadow and clothing. To the extent that these comments support a finding that employment decisions were being made on the basis of sexual stereotypes, they support a sex discrimination claim. Undue preoccupation with what female employees look like is not permissible under anti-discrimination laws if the same kind of attention is not paid to male employees.[19] Traditional ideas about what a woman should look like are not legitimate criteria for evaluating women in the workplace. See National Organization for Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 533, 318 A.2d 33, 38-39 (1974) ("[S]tereotyped conceptions ... [of females are] discordant with current rational views as to the needs, capabilities and aspirations of the female, child or woman."). Kahwaty's two comments, however, are insufficient, in and of themselves, to support a hostile environment claim. Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere. See also Meritor Savings Bank, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Gilbert v. Little Rock, 722 F.2d 1390 (8th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984).
 
 
 38
 There are times when circumstantial evidence creates enough question about whether there is a genuine issue of material fact for a non-moving party to survive summary judgment, see Williams v. Borough of Westchester, 891 F.2d 458, 460 (3d Cir.1989), but this is not such a case. Thus, although evidence of an atmosphere sufficiently infused with sexual innuendo might be sufficient to satisfy the Andrews test, see supra at 860, plaintiff has not put forth sufficient evidence to show that the environment, from which we could infer pervasiveness (prong two of Andrews ), caused her to suffer because of her sex (prong one of Andrews ). Nor is there sufficient evidence to show that questionable stereotyping, from which we could infer discrimination, was pervasive and regular. Therefore, we will affirm the district court's grant of summary judgment for defendants on plaintiff's sex discrimination claim.[20]
 
 IV. THE RETALIATION CLAIM
 
 39
 All of the remaining claims depend on count three, the retaliation claim. Count three alleges that defendants retaliated against her in violation of the NJLAD. Retaliation against an employee who is engaging in activity protected by the NJLAD constitutes a violation of the NJLAD. N.J.S.A. 10:5-12(d) provides:
 
 
 40
 It shall be an unlawful employment practice, or, as the case may be, unlawful discrimination ... For any person to take reprisals against any person because he [or she] has opposed any practices or acts forbidden under this act or because he has filed a complaint, testified or assisted in any proceeding under this act.
 
 
 41
 Count four is a state constitutional claim, the vitality of which probably depends upon count three, the NJLAD violation.[21] Count five is a state tort claim for wrongful discharge, which requires a concurrent violation of the NJLAD.[22] Count eight is a contractual claim for money damages, the vitality of which depends upon whether plaintiff was constructively discharged, which is a fact-bound inquiry dependent on whether UC retaliated against her.[23] Thus, whether plaintiff survives summary judgment on any of the surviving counts depends on whether she survives summary judgment under count three. The district court dismissed plaintiff's retaliation claim in three sentences:
 
 
 42
 It is patent that Kahwaty's conduct toward [plaintiff] was a byproduct of his own relationship with Schembri. It is equally clear that defendants' treatment of Drinkwater occurred in retaliation for her opposition to the liberties which Schembri and Kahwaty took with Union Carbide's resources, policies and chain of command. None of this activity, however, could reasonably be believed to have resulted from the fact that Drinkwater possessed the protected characteristic of womanhood.
 
 
 43
 App. at 268.
 
 
 44
 Defendants argue in their briefs that the Superior Court decision in Erickson v. Marsh & McLennan Co., Inc., 227 N.J.Super. 78, 545 A.2d 812 (1988), forecloses plaintiff's retaliation claim. As discussed above, Erickson was affirmed, for the most part, by the Supreme Court, Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 569 A.2d 793 (1990). Mr. Erickson alleged that he was retaliated against for hiring a lawyer to defend himself against sexual harassment charges. The New Jersey Supreme Court held that protecting oneself against sexual harassment charges was not the same as registering complaints about harassment and hence Erickson's actions could not be considered protected activity within the meaning of the NJLAD. Accordingly, the court ruled that Erickson could be dismissed "at-will" as a "contentious" employee. See 117 N.J. at 561, 569 A.2d at 804.
 
 
 45
 This case is distinguishable from Erickson because Ms. Drinkwater is not alleging that she was retaliated against for defending herself against harassment charges; she alleges that she was retaliated against for complaining about being harassed herself. Unlike Erickson and Kephart v. Institute of Gas Technology, 630 F.2d 1217, 1223 (7th Cir.1980), the case on which the Superior Court in Erickson relied, there is nothing in this record, save Kahwaty's note that she was "sleepy" at a staff meeting, indicating that Drinkwater was performing in an unsatisfactory manner. The record reveals that Robinson wanted to give her a "2" or a "3a" rating, but that Kahwaty insisted that it be a "5." She was only "contentious" to the extent that she complained about a situation that she felt was discriminatory.
 
 
 46
 Defendants seem to read Erickson as holding that retaliation and discrimination claims are not independently viable. The district court rejected this broad, "prophylactic" reading of Erickson, App. at 267, and we see nothing in the Supreme Court's Erickson opinion suggesting that such a prophylactic reading is appropriate. The standard that the district court did adopt comes from a long line of Title VII cases which hold that a plaintiff establishes a retaliation claim if she shows that she had a reasonable belief that her employer was engaged in an unlawful employment practice and that the employer retaliated against her for protesting against that practice. See, e.g., Hicks v. ABT Assoc. Inc., 572 F.2d 960, 967-69 (3d Cir.1978); Jennings v. Tinley Park Comm. Consol. School Dist., 796 F.2d 962, 967 (7th Cir.1986), cert. denied, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987); EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1013 (9th Cir.1983). These cases show that defendants' reading of Erickson is inconsistent with settled Title VII jurisprudence, upholding the severability of retaliation and discrimination claims. Thus, we agree with the district court that New Jersey would apply the Title VII standard to claims under the NJLAD, but disagree with the district court's determination under that standard.
 
 
 47
 In determining the reasonableness of plaintiff's belief that she was being discriminated against, it is necessary to look first to the pre-existing case law. See, e.g., Berg v. LaCross Cooler Co., 612 F.2d 1041, 1042-43 (7th Cir.1980). In the case at bar, both parties' counsel and the district court turned to what were then the two predominant cases in the area of consensual sexual relationships giving rise to discrimination claims, King v. Palmer, 598 F.Supp. 65 (D.C.Cir.1984), rev'd on other grounds, 778 F.2d 878 (D.D.Cir.1985), and DeCintio v. Westchester County Medical Center, 807 F.2d 304 (2d Cir.1986), cert. denied, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Although those cases did not involve the same kind of sexual harassment hostile environment claim involved here, see supra at 860-862, given the dearth of case law in this area, they were arguably relevant to the plaintiff's claim in this case.
 
 
 48
 When plaintiff first complained about the Kahwaty/Schembri affair, in the fall of 1984, only King had been decided, and it had been decided in plaintiff's favor. The district court opinion in King held that a plaintiff made out a prima facie case by presenting sufficient evidence that a sexual relationship between a supervisor and a co-worker was a substantial factor in the co-worker's promotion. 598 F.Supp. at 67. The D.C. Circuit adopted, without deciding, this holding. 778 F.2d 878 (D.C.Cir.1985). The record in this case would be sufficient to support a prima facie case under the law as interpreted in King.
 
 
 49
 It is true that later cases have been decided less favorably for plaintiff,[24] and that the law in New Jersey, established in Erickson, has now rejected the broad holding in King. Nonetheless, the fact that, when plaintiff began her lawsuit, there was conflicting authority (in different circuits) on whether a female plaintiff could survive summary judgment by alleging that she was denied a job because of a consensual sexual relationship between a supervisor and a co-worker, certainly would support a finding that plaintiff was reasonable in believing that she had a claim. Plaintiff is not required to guess the outcome of New Jersey law correctly, ex ante. It is particularly noteworthy that, in discussing the reasonableness of plaintiff's belief that she had a claim, the district court itself had to state its disagreement with King. App. at 264.
 
 
 50
 It is true that, had plaintiff been pursuing her case after Erickson, she would not, given the paucity of recorded evidence supporting her claim,[25] have had a reasonable basis to proceed. However, within the "window" open to her before it was shut by Erickson, we cannot say that there is no genuine issue of material fact as to the reasonableness of her belief at that time.
 
 
 51
 Plaintiff pled a hostile environment. She cannot survive summary judgment on that count because she has not shown us how this hostile environment affected her as a woman, but there is ample evidence that the environment did affect her, that she subjectively felt that the problems arose because she was female and that she therefore reasonably believed that she had a sexual harassment claim.
 
 
 52
 Indeed, the defendants' own activity indicates that they might have thought that plaintiff was voicing legitimate sexual harassment concerns. When Kahwaty became aware of plaintiff's complaints in October of 1984, he increased his pressure to have her sign the Hageman sexual harassment claim non-disclosure statement. Kahwaty's eagerness to have plaintiff sign the statement suggests that he might have thought plaintiff had a sex discrimination claim. When plaintiff spoke with Austin on October 12, 1984, Austin assured plaintiff that any kind of retaliatory action against plaintiff was against the law. Clearly, Austin thought that plaintiff might have had a discrimination claim.
 
 
 53
 On January 18, 1985, plaintiff's counsel wrote a letter to UC, saying that she had investigated the incidents and that she was satisfied that UC had discriminated against plaintiff on the basis of her sex. The letter explicitly demanded that the company stop its discriminatory practices. App. at 81. There is no question that, after it received that letter, UC knew that plaintiff believed in the validity of her sex discrimination claim, and the evidence is quite strong that plaintiff was treated badly after UC became aware of her protestations.
 
 
 54
 In sum, there is not enough evidence that defendants' behavior constituted sexual harassment, but there is enough evidence to support a finding that plaintiff was harassed for complaining about what she thought was a discriminatory atmosphere. UC is not free to retaliate against plaintiff simply because she has failed to build her sex discrimination claim properly. More specifically, the case law existing at the time of the incidents, plaintiff's consultation with counsel and UC's own behavior, including Austin's comments about retaliation, Kahwaty's and Austin's secrecy and evasiveness with regard to the Hageman non-disclosure form, Kahwaty's comments about women and grooming, and Austin's comments about previous difficulties with women, would support a finding that plaintiff reasonably believed that she had a sex discrimination claim as the law stood at that time. Thus, plaintiff's retaliation claim under N.J.S.A. 10:5-12(d) survives defendant's motion for summary judgment.
 
 
 55
 As explained above, see supra typescript at 863-864, counts four, five and eight depend upon the extent to which UC retaliated against plaintiff. Had we affirmed the summary judgment on the retaliation claim, we would have been obliged to affirm the summary judgment on counts four, five, and eight. The converse is not necessarily true, but since the parties have not separately briefed the other grounds for possible judgment on those issues, we will reverse the grant of summary judgment on those counts as well, and leave them for the district court in the first instance on remand.
 
 V.
 
 56
 For the foregoing reasons, the grant of summary judgment in favor of defendant and against plaintiff with regard to count two will be affirmed, but the grant of summary judgment on counts three, four, five and eight will be reversed and the case remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The following facts were adduced in discovery. They are, for the most part, undisputed; where there is a dispute, we interpret the disputes in the light most favorable to the plaintiff, if it is reasonable to do so. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986)
 
 
 [2]
 Union Carbide rates its employees on a scale of 1 through 5. Salary adjustments are made on the basis of the grade an employee receives. The financial ramifications of a "5" rating are equivalent to a "3," which indicates adequate performance for salary purposes. In contrast, receiving an above average grade, for instance a "2," usually leads to a raise
 
 
 [3]
 Plaintiff did not receive the first mortgage differential payment until May of 1985, six months after she had qualified for it. She received only four more of those payments while working for UC. She received six more payments in a lump sum after she left UC, but is still owed payments for the remaining months during which she worked for UC in New Jersey
 
 
 [4]
 When plaintiff first arrived in Somerset, she lived at the Hilton, but she was later instructed by Kahwaty that she should have stayed at the somewhat less expensive Holiday Inn. Kahwaty told her to reimburse Union Carbide for the difference
 
 
 [5]
 Kahwaty flatly contradicts these allegations, but we are bound to interpret the evidence in the light most favorable to the plaintiff if it is reasonable. See supra note 1
 
 
 [6]
 UC was named as a defendant in all counts. Kahwaty was named in counts two through seven and count nine. Pratt was named in counts three through five, seven and nine
 
 
 [7]
 Such a rule is consistent with the Supreme Court's pronouncement in Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988), that although courts may not waive the jurisdictional requirements of Fed.R.App.P. 3 and 4, they may nevertheless construe those rules liberally. See United States v. Rivera Construction Co., Inc., 863 F.2d 293 (3d Cir.1988). Moreover, a liberal reading of the Elfman standard has been endorsed by this court after Torres. In Williams v. Guzzardi, 875 F.2d 46, 49 (3d Cir.1989), we noted that it is proper to exercise appellate jurisdiction "over orders not specified in the notice of appeal if there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issue." See also Murray v. Commercial Union Insurance Co., 782 F.2d 432 (3d Cir.1986)
 
 
 [8]
 We do not find the same degree of interdependence or incorporation between counts one and six (the discrimination in payments and defamation claims), the judgments on which were not specifically appealed from, and the claims (retaliation, constitutional, wrongful discharge and contractual) that were specifically appealed from. Thus, particularly in light of plaintiff's failure even to mention counts one and six before this court, we will treat the May 27, 1987 order in favor of defendants on those counts as unappealable at this late date. See Fed.R.App.P. 4(a)(1)
 
 
 [9]
 It is possible that plaintiff is also asserting a quid pro quo sexual harassment claim, i.e. one in which an employee was required to give sexual favors in order to be hired, promoted or retained. See Craig v. Y. & Y. Snacks, Inc., 721 F.2d 77 (3d Cir.1983). However, she adduced no evidence to that effect. If plaintiff felt that Kahwaty treated her badly because she was not sexually attractive to him and that he was using sexual attractiveness as a performance criterion, then she must give the court some basis on which to so find
 
 
 [10]
 EEOC guidelines are accorded deference in sexual harassment discrimination cases. See, e.g., Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); Bundy v. Jackson, 641 F.2d 934, 947 (D.C.Cir.1981). Because of the prominence of federal law in the employment discrimination field, state courts often look to federal precedent, see, e.g., Erickson v. Marsh & McLennan Co., 117 N.J. 539, 569 A.2d 793, 801-02 (1990), and, in this diversity case, we, too, shall consider it
 
 
 [11]
 See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Andrews and Conn v. City of Philadelphia, 895 F.2d 1469 (3d Cir.1990); Bundy v. Jackson, 641 F.2d 934 (D.C.Cir.1981); Henson v. City of Dundee, 682 F.2d 897, 901-05 (11th Cir.1982); Moylan v. Maries County, 792 F.2d 746 (8th Cir.1986); Swentek v. USAir, Inc., 830 F.2d 552 (4th Cir.1987); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414-17 (10th Cir.1988). See generally B.L. Schlei & P. Grossman eds., Employment Discrimination Law 426 (2d ed. 1983); Note, The Aftermath of Meritor: A Search for Standards in the Law of Sexual Harassment, 98 Yale L.J. 1717 (1989); Note, Sexual Harassment Claims of Abusive Work Environment Under Title VII, 97 Harv.L.Rev. 1449 (1984)
 
 
 [12]
 See King v. Palmer, 598 F.Supp. 65 (D.D.C.1984), rev'd on other grounds, 778 F.2d 878 (D.C.Cir.1985); DeCintio v. Westchester County Medical Center, 807 F.2d 304 (2d Cir.1986), cert. denied, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); Broderick v. Ruder, 685 F.Supp. 1269 (D.D.C.1988); Miller v. Aluminum Co. of America, 679 F.Supp. 495 (W.D.Pa.), aff'd, 856 F.2d 184 (3d Cir.1988); Handley v. Phillips, 715 F.Supp. 657 (M.D.Pa.1989); Nicolo v. Citibank New York State, N.W., App.Div., 554 N.Y.S.2d 795 (1990); Kersul v. Skulls Angels, Inc., 130 Misc.2d 345, 495 N.Y.S.2d 886 (1985)
 
 
 [13]
 See Broderick v. Ruder, 685 F.Supp. 1269 (D.D.C.1988). On its facts, King is arguably such a hostile environment case; the district court noted that office morale had been hurt by concern about the supervisor/co-worker relationship. See 598 F.Supp. at 67
 
 
 [14]
 For racial harassment cases, see, for example, Gilbert v. City of Little Rock, 722 F.2d 1390 (8th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984); Cariddi v. Kansas City Chiefs Football Club, 568 F.2d 87 (8th Cir.1977). For sexual harassment cases, see supra notes 11-12
 
 
 [15]
 We recognize that cases like Erickson and DeCintio contain language which can be broadly read to proscribe any kind of gender discrimination claim which is rooted in conditions created by a consensual sexual relationship, but we decline such readings. The theoretical basis for the kind of environmental claim alleged here is that the sexual relationship impresses the workplace with such a cast that the plaintiff is made to feel that she is judged only by her sexuality. In light of our conclusion that there is insufficient evidence on this record for plaintiff to survive summary judgment on this claim, see infra, we need not engage the interesting question whether a female plaintiff can successfully maintain that the history of discrimination against women in the workplace and the theory behind hostile environment sexual harassment law creates causes of action for discrimination that may be available to women but not men under New Jersey law. In the quid pro quo cases, sexual harassment claims are equally available to men and women, but non-quid pro quo hostile environment cases depend on the underlying theory that "[w]omen's sexuality largely defines women as women in this society, so violations of it are abuses of women as women." "The relationship of sexuality to gender is the critical link in the argument that sexual harassment is sex discrimination." C. MacKinnon, Sexual Harassment at 174, 151 (1979). The theory posits that there is a sexual power assymetry between men and women and that, because men's sexuality does not define men as men in this society, a man's hostile environment claim, although theoretically possible, will be much harder to plead and prove
 
 
 [16]
 In Broderick the court found that a prima facie sexual harassment claim had been made out with plaintiff's evidence of pervasive sexual conduct in the office. This conduct included managers who continually referred to female employees' sexuality and bestowed preferential treatment upon those who submitted, apparently consensually, to sexual advances. There was also evidence that this atmosphere undermined plaintiff's motivation and affected job opportunities
 
 
 [17]
 There is some indication in the record that the level of sexual hostility in the environment was heightened more than plaintiff has articulated. When Kahwaty first learned that plaintiff was complaining, he increased his efforts to get her to sign the non-disclosure statement regarding a previous employee's sexual harassment claim. Thus, Kahwaty appears to have been somewhat preoccupied with potential sexual harassment charges. Additionally, when plaintiff first met with Austin, the employee relations representative, Austin, on her own, brought up the problems that Bramande's group had had with female employees and the previous investigation of Kahwaty and Schembri with regard to the Hageman incident. Nonetheless, plaintiff fails to link these possible past violations to her own claim. An employer's nervousness about sexual harassment charges does not support an inference of a hostile environment. If plaintiff had showed how she was discriminated against, she might have been able to use this evidence to bolster her claim that the environment in Somerset was sexually hostile, but by itself, it is insufficient
 
 
 [18]
 The implication of this remark is that Kahwaty thought it appropriate to give "nice looking" women preferential treatment. Kahwaty apparently saw this as some kind of affirmative action decision (because "nice looking women [apparently] have a hard time making it"), but it is quite unlikely that his decision to afford preferential treatment to "nice looking women" would survive scrutiny under title VII. See cases cited in note 21, infra
 
 
 [19]
 Gerdom v. Continental Airlines, Inc., 692 F.2d 602 (9th Cir.1982) (en banc) (Weight requirements for flight hostesses disproportionately impacted on women, were not necessary for job and were therefore discriminatory); Laffey v. Northwest Airlines Inc., 567 F.2d 429, 454 n. 170 (D.C.Cir.1976) (Requiring women, but not men to wear contact lenses instead of glasses violates anti-discrimination laws). See also EEOC v. Sage Realty Corp., 507 F.Supp. 599 (S.D.N.Y.1981) (requiring women to wear revealing clothing that prompts sexual harassment from customers and male co-workers adversely affects the terms of employment.)
 
 
 [20]
 The evidence in the record supports plaintiff's position that she was detrimentally affected by what occurred, that it was not unreasonable for her to be so affected, and that the actors involved were of such stature in the company that UC might be liable for their conduct. Thus, there is no question that the third, fourth and fifth prongs of Andrews would be met for summary judgment purposes
 
 
 [21]
 We are not convinced that plaintiff has a cause of action under the New Jersey constitution in this case. In Peper v. Princeton University Board of Trustees, 77 N.J. 55, 79-80, 389 A.2d 465, 477 (1978), the New Jersey Supreme Court interpreted the New Jersey Constitution, Art. 1, Para. 1 to provide a private right of action for a woman alleging employment discrimination under the NJLAD. The NJLAD claim was then dismissed because of an explicit exclusion for private universities, but the court went on to evaluate the discrimination action under the equal protection clause that it found, implicitly, in Art. 1, Para. 1 of the state constitution. Peper compels the conclusion that plaintiff would have a constitutional claim if we were reversing on count two and allowing the plaintiff to go to trial on the sex discrimination claim. We are affirming on count two, however. Thus, any constitutional claim that plaintiff has must be based on an implicit retaliation cause of action, which would be found, theoretically, in the implicit equal protection clause of the New Jersey constitution
 Despite our reservations about whether the New Jersey constitution contains a private right of action for a retaliation claim under N.J.S.A. 10:5-12(d), the parties apparently conceded this point in the district court and the issue has not been briefed before us. The Magistrate found that "[b]oth parties agree[d] that ... [count four] ... survive[d] or succumb[ed] on the outcome of the NJLAD-based complaints. As it is recommended that summary judgment be denied as to count three, count four must also continue to trial, its fate thus linked with the claim of retaliatory discharge." Magistrate's Report and Recommendation, App. at 218-19. Under these circumstances, we will not decide the issue. See infra at 867.
 
 
 [22]
 Count five was withdrawn by consent agreement pending developments in New Jersey law but later reinstated by the district court. Wrongful discharge actions can be maintained only if the employer's actions violate a clear mandate of public policy. See Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). Although a violation of the NJLAD, by itself, is insufficient to warrant a companion wrongful discharge claim, see Blum v. Witco Chem. Co., 829 F.2d 367 (3d Cir.1987), Alexander v. Kay Finlay Jewelers, Inc., 208 N.J.Super. 503, 506 A.2d 379 (1986), when the claim is based on an employer's reaction to an employee's action or refusal to act, the NJLAD constitutes a clear public policy forbidding employers from terminating people protected by the anti-discrimination laws. See Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 191-92, 536 A.2d 237, 238 (1988) ("The public policy of the State of New Jersey should protect those who are in good faith pursuing information relevant to a discriminatory discharge.") We note that the New Jersey Supreme Court's recent decision in Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 569 A.2d 793 (1990), leaves some doubt as to whether plaintiff's wrongful discharge claim is preempted by the NJLAD. In Erickson, the court stated that "if [NJ]LAD creates a remedy, 'it might be unnecessary to recognize or create a Pierce-type action to vindicate substantially the same rights and provide similar relief.' " Id. at 562, 569 A.2d at 804 (quoting Shaner v. Horizon Bancorp., 116 N.J. 433, 454, 561 A.2d 1130, 1141 (1989)). This issue has not been briefed before us, however, and, in light of our remand on other issues, we will not decide the question. We note that plaintiff attempted to reinstate her retaliatory discharge claim on three occasions. The District Court reinstated count five in the April 19, 1989 opinion and then proceeded to dismiss it
 
 
 [23]
 We agree with the Magistrate that because plaintiff's contractual claim is "so intimately bound up with and dependent upon the issue of plaintiff's separation" (i.e., counts three through five), Magistrate's Report and Recommendation, App. at 223, count eight cannot be separated from the other claims
 
 
 [24]
 See DeCintio v. Westchester County Medical Center, 807 F.2d 304 (2d Cir.1986), cert. denied, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987); Miller v. Aluminum Co. of America, 679 F.Supp. 495 (W.D.Pa.1988), aff'd, 856 F.2d 184 (3d Cir.1989). Internal Operating Procedure 8(c) makes clear that only prior published opinions of the Third Circuit are binding on this court
 
 
 [25]
 In particular, we refer to the absence of evidence of an oppressive sexually accented work environment