Margaret Nava TOSCANO, Plaintiff,

v.

Robert NIMMO, the Administrator of the Veterans Administration, an Agency of the United States of America, Defendant.

Civ. A. No. 82–315–WKS.

United States District Court,
D. Delaware.

Aug. 31, 1983.

Sheldon N. Sandler, Barry M. Willoughby, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

Joseph J. Farnan, Jr., U.S. Atty., Theopalis K. Gregory, Asst. U.S. Atty., Wilmington, Del., for defendant.

### OPINION

STAPLETON, District Judge.

Plaintiff, Margaret Nava Toscano ("Toscano"), has sued Robert Nimmo, the Administrator of the Veterans Administration, claiming unlawful discrimination in connection with her employment with the Veterans Administration. The suit arises out of the denial of her application for a particular position she sought at the Veterans Administration Hospital in Elsmere, Delaware ("the Hospital"). The complaint alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the denial of due process of law in violation of the Fifth Amendment of the United States Constitution. The issues of liability were tried before the Court from May 12 through May 17, 1983. This Opinion constitutes the Court's findings of fact and conclusions of law.

### I. BACKGROUND

At the top of the bureaucratic structure of the Hospital was the Center Director, a position occupied by Robert Ryan at all times here relevant. Ryan's direct subordinate was Wilfred Kingsley, the Assistant Center Director. Directly below the Center Director and the Assistant Center Director were various "Chiefs" of the "services" in the Hospital, including Jesus Segovia ("Segovia"), Chief of the administrative arm of the Hospital, The Medical Administrative Service ("MAS"). Reporting to Segovia was Carlo Rattenni, Assistant Chief MAS.

The position of Medical Administration Assistant ("MAA") reported directly to the Chief and the Assistant Chief MAS. MAAs worked a rotating shift and were responsible for doing all of the administrative functions in the service during the evening and night hours. Toscano attained the position of MAA in 1974.

Also below the Chief MAS and the Assistant Chief MAS were three sections, including the Ward Administration Section ("WAS"). The head of WAS was the Chief WAS and directly below the Chief WAS were the ward secretaries, also called ward clerks. The position of Chief WAS was the position which Toscano, along with a number of others, applied for in September, 1978. Toscano was one of the five individuals selected by Personnel as being qualified for the position. The individual ultimately selected as Chief WAS was Donna Nelson, a ward clerk. The selection was made by Segovia and announced by him in October 1978.

At the time of her promotion, Nelson held a GS–4 civil service rating. Both the MAA and Chief WAS positions had a GS–7 rating, but the Chief WAS position was more desirable because of its supervisory role, greater access to training programs, and greater potential for further promotional opportunities. Advancement to the Chief WAS position was one of the most common routes followed by MAAs seeking career advancement.

Toscano claims she was discriminated against because Segovia conditioned his selection of the Chief WAS on his receiving sexual favors. The defendant disputes that the selection was based on sexual favors, and he contends, alternatively, that Nelson was more qualified than plaintiff and that the Veterans Administration did not have actual or constructive knowledge of Segovia's actions. Plaintiff also claims that she was retaliated against for filing charges of discrimination.

### II. THE PROMOTION CLAIM

 Title VII of the Civil Rights Act of 1964 prohibits sex discrimination with respect to terms, conditions, or privileges of employment.[1] This bar applies to a wide-

---

1. Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1), provides that:

ranging set of employment related actions from promotions and job assignments to rules as to grooming, weight, and smoking. Sex discrimination occurs when an employer differentiates on the basis of sex with respect to a condition of employment and the differentiation is not within a recognized legal justification such as where sex is a bona fide occupational qualification reasonably necessary to the normal operation of the employer's particular business.. An employer is not insulated from liability simply because some, but not all, employees of one sex are affected. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). Thus, even where, for example, one woman is promoted over another, if the unsuccessful applicant would not have been treated in the same manner if she were a man, the employer is still liable for sex discrimination. *Skelton v. Balzano*, 424 F.Supp. 1231, 1235 (D.D.C. 1976).

■ Sexual harassment in the context of employment can form the basis for a Title VII claim. In the typical case, the female plaintiff claims that her male supervisor requested sexual favors from her and conditioned some job benefit, for example a promotion, on her assent. Such a claim is cognizable under Title VII. *See, Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044 (3d Cir.1977).

This case is slightly different factually from the typical case, although no different in its theoretical underpinnings. Toscano maintains that in order for a woman to be selected as Chief WAS, it was necessary to grant sexual favors, a condition not imposed on men; this contention is consistent with the theory supporting recovery in the typical case. She does not seek to establish the existence of this condition, however, by showing she refused specific requests by Segovia for sexual favors and was then denied the position because of her refusal. Rather, she has offered proof in the form of evidence of the circumstances of Segovia's sexual affair with the applicant he in fact selected for the position. That liability under Title VII may be predicated on such a theory is supported by the guidelines of the Equal Employment Opportunity Commission. They state, in part:

> Where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit.

29 C.F.R. § 1604.11(g).

For the reasons that follow, I find that granting sexual favors was a condition to receiving the position of Chief WAS, an employment practice which discriminated against Toscano on the basis of sex.

**A. *SEXUAL FAVORS AS A CONDITION OF EMPLOYMENT***

■ A few months after his arrival in Elsmere in June of 1977, Segovia developed a pattern of increasingly unprofessional behavior. At first, Segovia made telephone calls from his home to the MAAs on duty during the evening and night shifts, ostensibly to determine if the MAAs were arriving to their posts on time, or if they needed something from him. Gradually, the calls increased. Segovia would frequently be intoxicated and make arbitrary demands that work be done. As time went on, however, these nighttime telephone calls took on a different tone as Segovia started to brag about sexual encounters he had supposedly engaged in with several female Hospital employees.

Segovia also frequently made sexual advances toward women employees under his supervision. Segovia telephoned Toscano at home and sang her a love song in Spanish. He telephoned Catherine Iorii, Chief of the Ambulatory Care Section, at home on a Sunday afternoon and propositioned her.

[I]t shall be an unlawful employment practice for an employer ... to discharge any individual ... or otherwise to discriminate against any individual with respect to ... terms, conditions, or privileges of employment because of such individual's ... sex....

He called Sharon Hustead, an MAA, at home and asked her to go to New York for the weekend with him. He propositioned Barbara Hines, a switchboard operator, calling her both at home and at work. During work hours, he also placed his hands on Toscano and Hines in a suggestive manner, and made suggestive remarks.

In the fall of 1978, Segovia concededly engaged in an affair with Donna Nelson, the successful applicant for the Chief WAS position. Prior to the summer of 1978, Nelson and Segovia were not well acquainted although they knew each other. During that summer, they discovered they lived in the same apartment complex when Nelson happened to walk by the swimming pool while Segovia was there. They did not then converse. The next time they met, sometime in August, it was again at the apartment complex while Nelson was walking her dog. Segovia came over and started a conversation. The conversation included his questioning her about her career goals at the Hospital.

The affair was initiated by Segovia. He ran into her one evening at the apartment complex, invited her to his apartment for drinks, and then propositioned her. Both Segovia and Nelson maintain this event did not occur until November 1978, after the selection for Chief WAS had been announced in October, 1978.

There is evidence to suggest the affair actually began before the selection, however. Prior to the selection, during night-time telephone calls to the Hospital, Segovia recounted sexual encounters with Nelson to both Toscano, and William Manley, another MAA. Additionally, Segovia's wife, in a letter written in early May 1979, stated that she had become friends with Nelson in August, 1978, which suggests Segovia and Nelson were in fact better acquainted prior to the selection than they maintained in their testimony.[2]

This evidence persuades me the affair did begin prior to the selection. Further, I find that Segovia awarded the position based on the receipt of sexual favors. I am not convinced by the suggestion that his interest in Nelson was strictly "personal."

Segovia demonstrated a total inability to separate his work life from "personal" matters during his tenure at the Hospital. He described himself as a life-long "womanizer", and he plainly made no attempt to expunge that aspect of his personality from his work life. As I have noted, he made telephone calls to proposition several female employees at home, he made phone calls to employees at work in which he described his supposed sexual encounters with female employees under his supervision, and he engaged in suggestive behavior at work. For Segovia to have selected someone for a position based on the receipt of sexual favors would have been entirely consistent with this pattern of conduct.

Further, Segovia's inquiry to Nelson about her career goals during their first conversation at the apartment complex is suggestive of his intent. The existing Chief WAS announced her impending departure to her group in August 1978, prior to the time the job was publicly posted. Segovia's inquiry, accordingly, occurred at the time when both he and Nelson knew of the vacancy in the position of Chief WAS. Segovia must also have been aware that Nelson was single and that she lived near him, thus undoubtedly making the possibility of a relationship seem more likely to him. When placed in the perspective of his total pattern of conduct toward women employees and the fact that he at some point soon thereafter admittedly initiated an affair with Nelson, Segovia's inquiry about Nelson's career goals, coming at the time and under the circumstances it did, evidences an intention to reward Nelson with the Chief WAS position in return for sexual favors.

2. At trial, Segovia's wife testified from a copy of the letter which she had altered, having crossed out "August" and replaced it with "January." She purports to have done this because she made a "mistake" and because she had really met Nelson in January 1979. Since her memory was undoubtedly fresher in May of 1979, when the letter was written, than at trial, I conclude the two did in fact meet in August, 1978.

What was implicit in Segovia's inquiry of Nelson in August, was explicit in a telephone call he made to Toscano. One night, at the end of September, 1978, when Toscano was on the midnight shift, Segovia called while apparently intoxicated and told her about a sexual encounter he had just had with Nelson. He then said he was going to give Nelson the job because she was "very good in making him feel good"—"she's a real professional at it." (Transcript B–158).

Finally, Segovia's handling of the selection process evidences his improper conduct. When filling a position at the Hospital, there is a certain amount of latitude permitted in choosing the civil service grades from which applicants will be considered. Here, Segovia recommended that the Chief WAS position, which was a GS–7 position, be posted as a "GS–5/6/7." This manner of posting meant that applicants at only a GS–4 level, such as Nelson, were eligible to apply. While Segovia's recommendation, which was in fact followed, was within Hospital guidelines, it was sufficiently unusual so as to suggest an intention on his part to award the position to Nelson if possible.

Further, Segovia attempted to have his superior, Wilfred Kingsley, the Assistant Center Director, sign off on the Veterans Administration paper work processing the selection of Nelson so that Kingsley's name would appear as the selecting official. And, when confronted with a specific claim by another MAA who had applied for the position, William Manley, that he had promoted Nelson based on his sexual relationship with her, Segovia denied having any role in the selection process and stated that the Chief-of-Staff, Dr. Jones, had directed him to make the decision because Nelson had worked for Jones's wife.

### 1. "Woman Scorned" Defense

In response to the foregoing evidence, the defendant stresses that much of it comes from Toscano's own testimony, and urges that she is an unreliable witness. The reason Toscano is not credible, it is suggested, is that she is a "woman scorned." Defendant alleges that Toscano had an affair with Segovia lasting from the summer of 1977 through December 1978 and that she expected to marry him. She supposedly never desired the position of Chief WAS and has only brought this lawsuit in revenge for Segovia's "jilting" her. I am satisfied, however, that the alleged affair between Toscano and Segovia never in fact occurred.[3]

Segovia came to Elsmere in June of 1977 to assume the assignment of Chief MAS. His wife did not move with him because she had a job with another government agency in Washington, D.C. Toscano and Segovia met shortly after his arrival. Toscano, as Director of the Spanish Speaking Coordinating Committee, had organized a seminar for the management personnel at the Hospital about problems encountered by Spanish speaking employees in the course of their employment with the Veterans Administration. She invited Segovia to attend the seminar, which he did, and he accompanied Toscano, her husband, and the guest speaker to lunch.[4]

After that time, Segovia and Toscano became social acquaintances. The relationship apparently developed primarily at Segovia's instigation because he was new to the area and did not know very many people. The Toscanos felt sorry for him and, because he was her boss, felt a certain obligation to socialize with him.

Segovia and Toscano infrequently ate lunch together at the Hospital and he would occasionally have dinner at the Toscano household or go out for a beer with Toscano's husband. When the Toscanos had a New Year's Eve Party in 1977, the Segovias were invited although only Mr. Segovia came.

---

**3.** Defendant further intimates, based on this and other alleged affairs, that Segovia was such a successful "womanizer" that he had no need to condition employment benefits on sexual favors. I am not persuaded, however, that Segovia was as "successful" as he maintains.

**4.** Toscano and Segovia are both of Hispanic national origin.

On one occasion in September 1977, when Toscano was in Washington on business accompanied by her husband and children, the Segovias took the Toscanos sightseeing and invited them to the Segovias' home. The Toscanos reciprocated this hospitality by taking the Segovias to dinner in May 1978 on one of Segovia's wife's visits to Delaware. After the summer of 1978, there was only limited social contact between either of the Toscanos and Segovia.

The evidence of an affair comes primarily from testimony of Segovia; Toscano denies any such involvement. I believe Toscano. She made a strong impression at trial as a highly credible individual. In sharp contrast, Segovia's testimony was riddled with illogical, inconsistent or preposterous stories. Further, if Segovia's story were true, one would expect there to be some corroborating evidence of the affair since it supposedly lasted for a year and a half. Indeed, given Segovia's general lack of discretion, it is almost inconceivable that such an affair could have existed over that length of time without some co-workers having witnessed some indiscreet behavior on their part. The record is notably lacking in such evidence, however. Only one piece of allegedly corroborating evidence from defendant's case warrants comment.

Defendant introduced a phone bill of Segovia's from July 1978 showing two long distance phone calls of two or three minutes duration each to Toscano's mother's house in New Mexico. During July 1978, Toscano's husband took their two children on a trip to New Mexico. Segovia maintains that Toscano, while supposedly staying with him, called her husband in New Mexico on Segovia's telephone, an allegation she denies.

Toscano points out that her mother's phone number was listed as an emergency number in her personnel file and that Segovia had access to her file. Given that Segovia had availed himself of his access to personnel files on other occasions for the purpose of obtaining employees' home phone numbers, it is certainly possible that he could have made those calls. He frequently called Toscano's husband at their home in Delaware and he may well have called him in New Mexico.[5]

I conclude that Toscano and Segovia did not engage in an affair.

### 2. The Qualifications Defense

Defendant also argues that Segovia's promotion decision was attributable not to sexual favors, but rather to Nelson's superior qualifications. I am not persuaded, however, that Nelson's qualifications were in fact superior to Toscano's.

The relevant criteria in the selection of Chief WAS were: (1) education; (2) awards; (3) experience; and (4) performance at the interview.

In terms of education relevant to the Chief WAS position, Toscano's record was clearly superior to Nelson's. Nelson had two years of secretarial training, while Toscano had a comparable number of college credits toward a degree in business administration. In addition, throughout her prior fifteen year career with the federal government, Toscano had taken numerous correspondence courses and seminars in areas related to hospital administration and personnel management. For example, Toscano took an independent study course, Basic Personnel Management, through the U.S. Civil Service Commission for which she received credit of the equivalent of 48 classroom hours. The seminars Nelson had taken, in contrast, were mostly unrelated to supervisory or administrative functions and were only a few hours of training. A typical example is "Telephone Courtesy" for which she was credited with one hour of training. Only *after* the selection, did Nelson begin taking the types of seminars Toscano had been taking for years.

With respect to "awards," Nelson had three "superior performance awards," while

---

**5.** Toscano's husband testified that while in New Mexico he did not receive a call from Segovia, but he was informed by his mother-in-law that some of his friends had attempted to reach him while he was out.

Toscano had one. It is difficult to believe that this disparity played any significant role in the decision, however, given the nature of the awards and the fact that both individuals were acknowledged by their supervisors to be good performers in their jobs.

Defendant maintains that Nelson's experience was more relevant and therefore superior to Toscano's because of the nature of their respective job responsibilities. A ward clerk's primary responsibility is to transcribe the physicians' orders in the patient charts into the requisite form for action by the appropriate hospital personnel. The MAA's have primary responsibility for administrative functions with respect to patients, e.g., admitting, discharge, notification of relatives, etc. In addition, during the off-hours, they handle all the functions normally assigned to the Medical Administration Service. In fact, the MAA is the highest ranking person of the administrative group on duty after regular hours.

The Chief WAS position is considered an important one because it is a service position with respect to the rest of the Hospital, requiring the orchestration of the schedules of the individual ward clerks in such a way as to meet the various demands of the rest of the hospital staff. Defendant suggests Nelson's nine years as a ward clerk were a more helpful experience for the Chief WAS position than was Toscano's MAA experience. This suggestion is not convincing.

I note first of all that Toscano had several years of equivalent ward clerk experience while working at the Army Hospital at White Sands Missile Range in New Mexico prior to coming to Wilmington. In addition, Toscano was certainly familiar with WAS procedures since she was responsible for *all* administrative functions, including those of WAS, during off-hours. She had also made at least one review of certain functions of the service which was well received by the Hospital's Executive Board.

Finally, the Chief of Personnel, James Rasco, Jr., testified that it was a common career path for an MAA to advance to Chief WAS. In fact, Segovia himself had advanced on that path and had found his MAA experience to be "particularly helpful" to being Chief WAS.

The final relevant criterion was the interview. Segovia supposedly selected Nelson, in part, because she presented good suggestions at her interview for improving the functioning of the Ward Administration Service. In contrast, Segovia testified that Toscano made no suggestions because she did not really want the position and was only applying as a "front." Toscano readily acknowledges that she did not make suggestions at the interview, but explains that Segovia only gave her a perfunctory interview without any opportunity for her to present her ideas.

As earlier noted, I do not credit Segovia's testimony that Toscano lacked interest in the Chief WAS position. Moreover, she was explicitly told by Segovia prior to the interview that he was not going to select her. I, therefore, believe Toscano's testimony that she did not receive a full interview and I am fully convinced of her seriousness in applying for the promotion. Based on the service audit work in her file, one can predict with some confidence that Toscano would have had constructive suggestions to make had she received a full interview.

The evidence shows that Nelson was qualified for the Chief WAS position and that she has performed well in that job. Nevertheless, the evidence regarding relative qualifications of these two candidates does not persuade me that Segovia's choice was not made on the basis of sexual favors. I say that both because of the strength of the evidence indicating that the receipt of sexual favors was the determining factor and also because the evidence indicates Toscano was as qualified, if not better qualified, than Nelson.

## B. ATTRIBUTION OF SEGOVIA'S ACTION TO HIS EMPLOYER

Defendant urges that his agency cannot be held responsible for unlawful conduct of Segovia unless his superiors knew or should have known that it was taking place. He

correctly points out that the record will not support a finding that those superiors knew or should have known that Segovia was promoting Nelson on the basis of sexual favors. I conclude, however, that such a finding is not a prerequisite to liability in a case of this character.

Initially, I note that this is not a case in which the plaintiff alleges that a supervisor has engaged in sexual harassment sufficiently pervasive as to create an abusive working environment. Such "hostile environment" cases [6] present a problem materially different from that presented by a case, like the instant one, in which a supervisory employee makes a decision to promote someone based on a criterion which discriminates on the basis of sex. *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982). In the latter case, traditional principles of respondeat superior render the employer responsible just as they do in a case in which an employee who is authorized to make a promotion decision does so on the basis of race. *Henson* at 909–911.[7]

There is a suggestion in *Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044 (3d Cir.1977) that an employer may avoid liability in a case of this character by taking "prompt and appropriate remedial action after acquiring ... knowledge" that the sex discrimination has occurred. 568 F.2d at 1049. For that reason, I note that Segovia's superiors not only failed to take prompt and appropriate remedial action when advised of what he had done, but took action which can fairly be construed as condoning and ratifying that conduct.

As detailed hereafter, Toscano had great difficulty in getting anyone to pay any attention to her complaint and no remedial action of any kind was taken for approximately a year. Moreover, the remedial action which was finally taken, a transfer of Segovia to the Veterans Administration Hospital in Boston, can hardly be considered appropriate. No disciplinary action was imposed on Segovia and he was not even reprimanded. To the contrary, he was in effect rewarded for his conduct by being transferred with a *promotion.*[8]

### C. CONCLUSION

In conclusion, based on all the evidence, I am persuaded that sexual favors played a role in the selection of the Chief WAS in September of 1978, that Toscano was discriminated against, and that, accordingly, she is entitled to some remedy. Determination of the scope of that remedy must await the contemplated hearing on issues relating to remedy.[9]

### III. RETALIATION

■ Title VII, 42 U.S.C. § 2000e–3(a), makes it unlawful to retaliate against any employee who has complained of or opposed a discriminatory practice.[10] To prevail under this section, the plaintiff must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action, and that a causal link exists between the two. *See Ferguson v. E.I. du Pont de Nemours & Company, Inc.,* 560 F.Supp. 1172, 1200 (D.Del.1983). Toscano claims she was harassed and con-

---

**6.** *See, e.g., Ferguson v. E.I. du Pont de Nemours & Co., Inc.,* 560 F.Supp. 1172 (D.Del.1983).

**7.** *But cf., Barnes v. Costle,* 561 F.2d 983, 995 (D.C.Cir.1976) (McKinnon, J. concurring).

**8.** Nothing was communicated to the Boston Veterans Administration Hospital concerning the subject matter of this suit.

**9.** Plaintiff has also claimed that she was discriminated against on the basis of national origin. The evidence on this claim was minimal and I am not persuaded. Because of the disposition I

make of this case, I need not reach plaintiff's due process claim.

**10.** 42 U.S.C. § 2000e–3(a) provides in part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, asserted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

structively demoted in retaliation for pursuing her discrimination claims.[11]

### A. HARASSMENT

There is no question that Toscano engaged in protected activity. The history of her discrimination complaints is a long and frustrating one. On September 7, 1978, Toscano complained to Carlo Rattenni, who was both an E.E.O. counselor and her immediate superior, about the remark Segovia had made indicating that he would not consider her for the Chief WAS position. After the selection was made, she complained to Rattenni that the selection had been on the basis of sexual favors. Rattenni indicated that he was not interested in her complaint, telling her that Nelson was qualified for the position and she would just be rocking the boat if she pursued her complaint.[12]

In January, 1979, she complained to Robert Ryan, the Director of the Hospital, about harassing phone calls she was receiving from Segovia and his wife. In February, 1979, after unsuccessful efforts to get Rattenni to be responsive to her complaints, Toscano contacted Marvin Page, the ex-chairperson of the Equal Employment Opportunity Committee at the Hospital.[13] She took Page's suggestion that she draft a complaint and returned to show him her draft later in the same month. The draft had explicit references to Segovia's having given Nelson the job on account of sexual favors but Page urged her to delete them. Instead, Toscano took the complaint to Ryan in March, 1979. Ryan did not read the complaint then but apologized for Segovia's harassment. Ryan also indicated to her that Segovia was going to be transferred. In July, 1979, Toscano filed her complaint with the Equal Employment Opportunity Commission.

The harassment against plaintiff took several forms. Segovia made countless harassing phone calls to her, both at work and at home, starting in late 1978 or the beginning of 1979. Segovia would tell her to stop complaining and not to say anything about Nelson.

Segovia also started to treat her differently on the job. Customarily, when the MAA assigned to the 4:00 P.M.—12:00 P.M. shift reported to duty, Segovia would brief the MAA about expected tasks and problems on the upcoming shift. Sometime after her complaint to Rattenni, however, Segovia stopped briefing Toscano, making it difficult for her to do her job properly. In addition, he stopped giving her the kind of assignments, such as reviews, normally given to the MAA on the day shift.

Segovia and his wife delivered a note to Toscano at the Hospital in April, 1979, under circumstances evidencing an intent to harass her. The note purported to be a refusal to return certain personal items to Toscano until she returned a necklace:

Margaret—

\* \* \* \* \* \*

I will not return the $100 ring, 2–$5.98 each sweat shirts, the X-mas tree $1.98, the exerciser $15 or the 2–red net bikini shorts you gave Mr. Segovia for his birthdays and Christmas until you return my $10 necklace.

The note was folded once, but not placed in an envelope. The Segovias handed it to the admissions clerk, an individual apparently known to be indiscreet. This individual read the note to others.

Toscano testified that she had never given Segovia the items mentioned in the note and I believe her testimony. Given the contents of the note and the circumstances under which it was delivered, it is apparent that it was intended to harass Toscano.

---

11. Toscano correctly points out that she was discouraged from filing a discrimination complaint. She has not suffered injury as a result, however, since she in fact filed her complaint and defendant has not pursued a possible statute of limitations defense.

12. The retaliation section of Title VII applies to more than just the filing of charges with the EEOC, and the institution of litigation; it also encompasses complaints to management. *Ferguson,* at 1200–1201.

13. Segovia was the current chairperson.

The timing of Segovia's harassment, beginning as it did shortly after she began her complaint process, coupled with Segovia's obvious motivation for retaliation, indicates that the harassment was retaliatory.

Defendant asserts that these actions are, nevertheless, not actionable because they merely reflect a personal dispute between Segovia and Toscano. Segovia's actions clearly were employment related, however. Segovia stopped providing her with information necessary to perform her job and stopped giving her the usual job assignments. He made harassing telephone calls to her at work. Further, by helping his wife to deliver the note, he deliberately participated in conduct intended to create the false impression among Toscano's co-workers that she had engaged in an affair with him in an effort to discredit her complaints.

I find, therefore, that Toscano was subjected to retaliatory harassment in violation of Title VII.

## B. CONSTRUCTIVE DEMOTION

In January, 1980, plaintiff voluntarily transferred from her MAA position at the GS–7 level to the position of secretary of the nursing service at the GS–5 level. She testified that the primary reason she took this transfer to a lesser grade level was because of the harassment she was receiving. Plaintiff urges, by analogy to the constructive discharge theory, that her voluntary demotion was a "constructive demotion."

Under the theory of constructive discharge, a voluntary termination is considered a discharge if a reasonable person would resign under similar conditions, *Ferguson* at 1203. The majority of courts require the plaintiff to show a deliberate attempt to create intolerable conditions, but not a specific intent to get rid of the plaintiff. *Id.* Although the suggested extension of this theory to cover a demotion is apparently novel, it is a logical one. I see no reason to distinguish the situation where an employer makes conditions so intolerable that the employee, in response, reasonably decides to take a demotion from one where the employee resigns. To reject such a constructive demotion theory would, in effect, penalize an employee for conduct amounting to a mitigation of damages.

I do not find a constructive demotion on the record in this case, however. Although I believe Toscano when she says she transferred because of the harassment she was receiving, the evidence is simply not sufficient for me to conclude that a reasonable person in her position would have transferred to a lower grade. As of January, 1980, Segovia had been gone from the Hospital for a month or two and so he was no longer in a position to harass her. As to the harassment Toscano was receiving from other individuals in the MAS area, her testimony was largely conclusory and does not, therefore, permit me to judge the scope of their harassment.

## IV. CONCLUSION

For the foregoing reasons, I find that defendant unlawfully discriminated against Toscano during the selection process for the position of Chief WAS and retaliated against her for engaging in protected activity.