130 Cal.Rptr.2d 57 (2003)
105 Cal.App.4th 945
Frances K. MACKEY et al., Plaintiffs and Appellants,
v.
DEPARTMENT OF CORRECTIONS et al., Defendants and Respondents.
No. C040262.
Court of Appeal, Third District.
January 28, 2003.
Review Granted April 23, 2003.
*59 Lawless & Lawless, Barbara A. Lawless, San Francisco, and Aelish M. Joyce, for Plaintiffs and Appellants.
Bill Lockyer, Attorney General, Jacob Appelsmith, Senior Assistant Attorney General, Vincent J. Scally, Jr., and Timothy G. Yeung, Deputies Attorney General, for Defendants and Respondents.
Certified for Partial Publication.[*] As Corrected January 31, 2003.
*58 HULL, J.
Plaintiffs appeal from judgments entered for defendants California Department of Corrections (CDC) and Cal Terhune, the Director of CDC, following entry of summary adjudications for defendants. Plaintiffs contend issues of fact remain on their sex discrimination, retaliation and related causes of action. We disagree and affirm.

*60 Facts and Procedural History
Plaintiff Edna Miller began working for CDC in 1979 as a correctional officer, and by 1995 had attained the rank of correctional counselor III (CC III). In 1995, Miller was transferred to Valley State Prison for Women (VSPW). At the same time, Miller's close friend, Cagie Brown, a correctional counselor II (CC II), was also transferred to VSPW. At all times relevant to this matter, the warden at VSPW was Lewis Kuykendall. His chief deputy warden was Vicki Yamamoto.
In or about 1994, Miller received information that led her to believe Kuykendall was having affairs with his secretary, Kathy Bibb, and an associate warden, Debbie Patrick. In or about 1995, Miller heard from another correctional officer, Francis Gantong, that Kuykendall was having an affair with Cagie Brown. Miller confronted Brown about the matter and later observed Brown intimidating, ridiculing and demeaning Gantong. Brown eventually informed Miller of her relationship with Kuykendall and boasted of her power with Kuykendall. Miller overheard Brown say she was going to use her relationship with Kuykendall to get things she wanted at work. Miller observed that, when Brown asked Kuykendall for privileges, her request was granted.
In or about 1995, Miller and Brown interviewed for a temporary position of facility captain. Prior to the interviews, Brown told Miller that Kuykendall had better give Brown the position, or she would "take him down," because she knew "every scar on his body." Despite Miller's rank of CC III and Brown's lower rank of CC II, and despite Miller's greater education, experience and certifications, Brown was given the promotion. In February 1996, Miller and Brown applied for a permanent facility captain position. Brown again received the promotion.
Between 1995 and 1997, Brown and Yamamoto developed a "close and powerful relationship." In 1997, Brown was promoted to associate warden, and became Miller's immediate supervisor. Brown and Yamamoto often had lunch and dinner together. Yamamoto "routinely" asked Miller to lunch and dinner, sometimes alone and sometimes with Brown, but Miller declined. Later, Brown and Yamamoto routinely countermanded Miller's orders to her staff and undermined Miller's authority. When Miller complained to Kuykendall, Yamamoto told Miller she was angry and "not to ever go to the Warden about her again."
On one occasion, Yamamoto directed Miller to lower a performance rating on one of Miller's subordinates, who was an excellent worker, and Miller objected. On another occasion, Miller ordered a subordinate employee to attend an audit at another facility. However, this order was countermanded by Brown and Yamamoto, who insisted that Miller attend herself. Because Miller was a single parent, this required her to drive to the audit three hours each way for four days.
When Miller returned from the audit, she discovered that Yamamoto had reassigned an area under Miller's supervision, the reception area, to another employee. This was humiliating to Miller, because normally such measures are taken for poor performance. A coworker told Miller that, in an office meeting, Yamamoto said she did not think Miller was doing her job. Another employee told Miller people around the institution were saying Miller was not doing her job. By this time the situation at work had gotten so bad that Miller was reduced to tears on a regular basis.
Plaintiff Frances Mackey began working for CDC in 1975 as an assistant clerk, and *61 was promoted to correctional case records manager in 1985. She was transferred to VSPW in September 1996, as the records manager for the reception center.
Through observations in and out of work and conversations with coworkers, including Edna Miller, Mackey surmised that Kuykendall was "involved with" Brown, Patrick, Bibb, and Yamamoto. Bibb liked to brag about having a direct line to the warden and received a promotion for which she did not meet the minimum qualifications. Mackey believed that Brown was moving up through the ranks too quickly, given her education and experience. Mackey concluded that Brown was sexually involved with Yamamoto.
At the time Mackey was transferred to VSPW, she was promised she would receive inmate pay, which is given to employees who have contact with inmates, amounting to $360 per month. Mackey received inmate pay until July 1997. In the spring of 1997, Mackey was assigned to the mainline records office, where there was no inmate contact. However, Brown told her the move was only temporary and promised Mackey she would continue to receive inmate pay. Later, Brown told Mackey she would not be returning to the reception area and was not entitled to inmate pay.
During the summer and fall of 1997, Brown mistreated Mackey by yelling and cursing at her and by calling her "useless" in front of other employees. Mackey's subordinates thereafter began questioning Mackey's instructions. The environment around the office became increasingly hostile because of Kuykendall's inability to control Brown.
In September 1997, Miller confronted Brown on the telephone about her relationship with Kuykendall and about Miller being harassed by Brown and Yamamoto. Brown acknowledged that Yamamoto was harassing Miller for no reason and was using a "power play" against her. Brown further indicated Kuykendall knew that Yamamoto "had it in for" Miller and would not do anything about it. Brown said she had control over Yamamoto but that Miller should "either deal with it or just forget it." Miller allowed Mackey, Zona Allen and Danette Paddford to listen in on this conversation.
The next day, Brown called Miller and accused her of taping the previous conversation. Brown said she was coming into the office to speak with Miller. Miller asked Mackey to come to her office for support. However, when Brown arrived, she ordered Mackey out. Miller tried to leave, telling Brown she "was going to report everyone, including [Brown's] affair with Kuykendall...." Brown grabbed Miller's arm and shook her back and forth. Miller was screaming and crying and tried to pull herself away. She moved into her secretary's office, where Brown pinned her against a filing cabinet. Brown kept Miller from leaving for two hours. Miller later told Mackey what had happened.
The next day, Mackey reported the incident to Kuykendall, who said he would take care of it. However, Mackey did not see him do anything thereafter. Kuykendall called Miller at home and asked what happened. The next Monday, Miller went to Kuykendall's office and reported the incident. She confronted him about his relationship with Brown, and he asked if she had proof. Miller indicated she felt forced to go outside the institution to get help. Kuykendall responded: "No one will believe you, it will just be an ugly scandal, and it would be your word against Cagie's word."
Kuykendall told Miller to take off a week and that, when she returned, she would not have to report to Brown or *62 Yamamoto. Miller returned to her office, where Brown questioned her about her discussion with Kuykendall. Brown authorized Miller to take off two weeks. During the two weeks, Kuykendall called Miller and told her to return and interview for a captain position. She did so, and a week later she was informed that she had gotten the promotion.
Sometime in 1998, Miller informed Kuykendall she was going to file a harassment claim, because he would not stop the harassment by Brown and Yamamoto. Kuykendall indicated that "because of his relationship with [Brown] and the fact that [Brown] had a rope around his neck because of her relationship with Yamamoto, that he did not trust her any longer." Kuykendall indicated Brown was playing him against Yamamoto. Kuykendall also expressed that he "should have chose[n] [Miller] instead of [Brown]...."
In 1998, an investigation was initiated by CDC's Office of Internal Affairs (OIA) regarding the conduct of Kuykendall, Brown and Yamamoto. Miller was interviewed by Kevin Cooper. However, Miller indicated that she could not tell Cooper anything, because OIA could not protect her from Kuykendall and the people who were covering for him. A week later, Miller was again interviewed by Cooper, who informed her if she did not answer his questions she would be disciplined. Cooper said he would not tell anyone that she had given information. Miller then reported what she knew about the warden's relationships with Brown, Bibb, and Patrick and what effects those relationships had on her. She also reported the telephone conversation that had been overheard by Mackey, Allen and Paddford.
Later, Brown contacted Miller and was furious that Miller had informed OIA about Brown's relationship with Kuykendall. Brown also recited the names of the people who had overheard the telephone conversation between Miller and Brown. Miller began hearing rumors that she had made up things to get Kuykendall and Yamamoto fired and was labeled as the person responsible for the OIA investigation.
Thereafter, Yamamoto began coming into Miller's unit for unexpected tours. Yamamoto interfered with Miller's instructions to charge two inmates with assault. In addition, Yamamoto refused to allow Miller to move an inmate when a staff member was under investigation for over familiarization with an inmate.
In 1995, Miller learned she suffered from an illness known as sarcoidosis, which substantially limited her ability to walk and move. When Miller was promoted to captain in 1997, Kuykendall assigned her to facility B, the closest to the front gate of the prison, as an accommodation for her condition. However, on June 22, 1998, after Miller's OIA interview, Kuykendall sent Miller a memorandum, indicating she would be reassigned to facility D, the furthest from the main gate. Miller reminded Kuykendall of her condition, and he responded that she would get no special privileges. Miller asked to take her secretary along with her and Kuykendall told her to take it up with Yamamoto. She did so, and Yamamoto refused her request. Yamamoto also directed Miller to stop using a handicap parking space.
Miller became ostracized at work. Inmates came to her office and said things like, "I heard you tried to get the warden fired." Coworkers refused to look at, or to talk to, Miller. On August 5, 1998, Miller was told Kuykendall and Yamamoto were looking for her. She began experiencing extreme pain in her heart and shortness of breath and was taken to a hospital.
*63 Mackey too was interviewed by Cooper, as part of the OIA investigation. Mackey was told her statements were confidential. Brown thereafter left messages on Mackey's answering machine, asking what she had told the investigator. Brown also tried to reach Mackey outside work, and Mackey became stressed and fearful. Miller told Mackey that Brown knew what they had said in the interviews. On August 5, 1998, Mackey became so stressed at work that she suffered an "attack" and was taken from work in an ambulance.
Mackey returned to work in or about January 1999. She was assigned an office assistant's job in the mail room. The interim warden told Mackey in front of another employee that Mackey was "disruptive" and "demanding." Mackey was eventually returned to the records department but was made a comanager with another. Thereafter, staff ignored Mackey and consulted the comanager on any issues that arose. Mackey left CDC in May or June 1999.
Miller presented a government tort claim to CDC in November 1998. Mackey presented a tort claim in February 1999. Both Miller and Mackey filed complaints with the Department of Fair Employment and Housing (DFEH) in March 1999. On June 15, 1999, Miller and Mackey filed suit against CDC, VSPW and Terhune, alleging 12 causes of action, to wit: (1) sex discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov.Code, § 12900 et seq.); (2) sex discrimination in violation of public policy; (3) retaliation in violation of the FEHA; (4) retaliation in violation of public policy; (5) disability discrimination in violation of the FEHA (Miller only); (6) disability discrimination in violation of public policy (Miller only); (7) negligent retention and promotion; (8) invasion of privacy; (9) assault and battery (Miller only); (10) false imprisonment (Miller only); (11) defamation; and (12) intentional infliction of emotional distress.
Defendants moved for summary judgment or, in the alternative, summary adjudication of issues. The court granted summary judgment as to Mackey. The court concluded there was no discrimination based on sex, and therefore no retaliation for engaging in protected activities. The court further concluded that Mackey's seventh (negligent retention), eighth (invasion of privacy) and twelfth (infliction of emotional distress) causes of action were barred by workers' compensation exclusivity. The court also granted summary adjudication on the eleventh cause of action for defamation. Judgment was entered against Mackey and in favor of CDC and Terhune.
As to Miller, the court granted summary adjudication on the discrimination and retaliation claims for the same reasons as stated for Mackey. The court also found the seventh, eighth and twelfth causes of action barred by workers' compensation exclusivity. The court found Miller's ninth (assault and battery) and tenth (false imprisonment) causes of action barred by the statute of limitations, and found her eleventh cause of action (defamation) to be without merit. However, the court denied summary adjudication on Miller's disability discrimination claims. Plaintiffs' motion for reconsideration was denied. The court, thereafter, granted Miller's motion to dismiss her remaining claims and entered judgment against Miller and in favor of CDC and Terhune.

*64 Discussion

I[**]

II

Sex Discrimination
Plaintiffs allege that defendants discriminated against and harassed them on the basis of their sex in violation of the FEHA and public policy. In particular, plaintiffs allege that defendants favored women who engaged in sexual relations with their superiors, and because plaintiffs did not do so they were treated differently. Plaintiffs further allege that, from July 1995 to approximately August 5, 1998, they "were forced to work in a hostile work environment where women got ahead and were promoted if they performed sexual favors for employees of [CDC]...." According to plaintiffs, promotions and managerial duties were not given to them but were instead given to less qualified employees who performed sexual favors for their superiors.
Under the FEHA, it is an unlawful employment practice for "an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person" to harass an employee "because of ... sex...." (Gov.Code, § 12940, subd. (j)(1).) "[A]ny other person" includes a supervisory level employee. (Page v. Superior Court (1995) 31 Cal. App.4th 1206, 1210-1211, 37 Cal.Rptr.2d 529.) Sexual harassment is a form of discrimination. (Meritor Savings Bank v. Vinson (1986) 477 U.S. 57, 66-67,106 S.Ct. 2399, 2405-2406, 91 L.Ed.2d 49, 59.) There are two general categories of sexual harassment: (1) quid pro quo harassment, which occurs when a term of employment is conditioned on unwelcome sexual advances; and (2) hostile work environment harassment. (Accardi v. Superior Court (1993) 17 Cal.App.4th 341, 348, 21 Cal. Rptr.2d 292.) "[S]exual harassment of the second type, the creation of a hostile work environment, need not have anything to do with sexual advances. [Citations.] It shows itself in the form of intimidation and hostility for the purpose of interfering with an individual's work performance." (Ibid.)
In order to establish a claim of environmental sexual harassment, the plaintiff must prove, among other things, the harassment was sufficiently pervasive to alter the conditions of employment. (See Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal.App.3d 590, 608, 262 Cal.Rptr. 842.) This is both an objective and a subjective requirement: "The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended." (Id. at pp. 609-610, 262 Cal.Rptr. 842, fn. omitted.) While tangible job detriment is not necessary, the absence of such detriment requires a higher showing of a concerted pattern of harassment. (Id. at p. 610, 262 Cal.Rptr. 842.) "In determining what constitutes `sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." (Ibid.)
Although there have been few state court decisions to consider a claim similar to that presented here, i.e., where the alleged sexual harassment is based on favorable treatment of those who engage in sexual relations with supervisors, the issue has come up often in federal decisions applying title VII of the Civil Rights Act of *65 1964 (42 U.S.C. § 2000e et seq.). We look to this federal law for guidance in deciding FEHA claims. (See Etter v. Veriflo Corp. (1998) 67 Cal.App.4th 457, 464, 79 Cal. Rptr.2d 33; Levy v. Regents of University of California (1988) 199 Cal.App.3d 1334, 1343, 245 Cal.Rptr. 576.)
A number of federal decisions have held that a coworker's romantic involvement with a supervisor does not alone create a hostile work environment. (See, e.g., Womack v. Runyon (11th Cir.1998) 147 F.3d 1298, 1299-1301; Taken v. Oklahoma Corp. Com'n (10th Cir.1997) 125 F.3d 1366, 1369; Becerra v. Dalton (4th Cir.1996) 94 F.3d 145, 149-150; Candelore v. Clark County Sanitation Dist. (9th Cir. 1992) 975 F.2d 588; Drinkwater v. Union Carbide Corp. (3d Cir.1990) 904 F.2d 853, 862; DeCintio v. Westchester County Medical (2d Cir.1986) 807 F.2d 304, 306; Miller v. Aluminum Co. of America (W.D.Pa. 1988) 679 F.Supp. 495, 501, affd. (3d Cir. 1988) 856 F.2d 184.) In DeCintio v. Westchester County Medical, supra, 807 F.2d 304, the court explained: "As the Supreme Court noted in Trans World Airlines v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), `[t]he emphasis of both the language and the legislative history of [Title VII] is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin.' Id. at 71, 97 S.Ct. at 2270 (emphasis added). The proscribed differentiation under Title VII, therefore, must be a distinction based on a person's sex, not on his or her sexual affiliations." (DeCintio v. Westchester County Medical, supra, 807 F.2d at pp. 306-307.) In other words, the fact that one is treated less favorably than a supervisor's paramour is not a distinction based on sex, because both males and females who are not the paramour are treated equally.
The one state court decision to have considered the matter is in accord. In Proksel v. Gattis (1996) 41 Cal.App.4th 1626, 49 Cal.Rptr.2d 322, the Court of Appeal relied, in part, on a federal Equal Employment Opportunity Commission (EEOC) notice stating: "`Not all types of sexual favoritism violate Title VII. It is the Commission's position that Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a `paramour' (or spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.' (EEOC Notice No. 915-048 (Jan. 12, 1990), fn. omitted, italics added.)" (Proksel v. Gattis, supra, at p. 1630, 49 Cal.Rptr.2d 322.)
Plaintiffs contend the present matter involves more than just a single consensual sexual relationship between a supervisor and a coworker. Here, there was evidence of at least three such relationships carried on by Kuykendall while plaintiffs worked at CDC. There is also evidence that Kuykendall's paramours were given preferential treatment, and at least one engaged in harassing and assaultive behavior. Plaintiffs contend this conduct created a hostile work environment for women by making them believe they would have to engage in sexual relations with supervisors in order to get ahead.
Plaintiffs rely on several federal court opinions to support their contention that the conduct at issue here created a hostile work environment. In Toscano v. Nimmo (D.Del.1983) 570 F.Supp. 1197, the plaintiff claimed a violation of title VII where a promotion had been given to a supervisor's paramour rather than to the plaintiff. The *66 court found a violation, despite the fact it was a woman who had been given preferential treatment over another woman. The court explained: "An employer is not insulated from liability simply because some, but not all, employees of one sex are affected. [Citation.] Thus, even where, for example, one woman is promoted over another, if the unsuccessful applicant would not have been treated in the same manner if she were a man, the employer is still liable for sex discrimination." (Id. at p. 1199.)
In King v. Palmer (D.D.C.1984) 598 F.Supp. 65, reversed on other grounds (D.C.Cir.1985) 778 F.2d 878, a female nurse claimed discrimination based on the denial of a promotion that went instead to a less qualified female nurse who had a sexual relationship with the promoting doctor. Although the court found the evidence insufficient to support the claim, it concluded that the plaintiff had made out a prima facie case. The court explained that, in addition to evidence sufficient to create an inference that a sexual relationship existed, other elements of a prima facie case were also present, to wit, "that plaintiff was a member of a protected class, that she applied and was qualified for a job for which the employer was seeking applicants, and that she was rejected...." (King v. Palmer, supra, at p. 67.)
In Priest v. Rotary (N.D.Cal.1986) 634 F.Supp. 571, the court stated that unlawful discrimination occurs "when an employer affords preferential treatment to female employees who submit to his sexual advances or other conduct of a sexual nature, or when, by his conduct or statements, implies that job benefits will be conditioned on an employee's good-natured endurance of his sexually[]charged conduct or sexual advances." (Id. at p. 581.) The court also indicated that a hostile work environment claim can be established by evidence that the supervisor "grabbed [the plaintiff], touched intimate parts of her body, tried to kiss her, rubbed his body on hers, picked her up and carried her across the bar room, made sexually suggestive comments to and about her in the presence of others which violated her right to privacy, exposed his genitals to her, and subjected other female waitresses to similar treatment, of which plaintiff was aware." (Id. at p. 582.)
In Broderick v. Ruder (D.D.C.1988) 685 F.Supp. 1269, the court indicated that, under circumstances similar to those presented here, a discrimination claim can be established in either of two ways: "A `hostile work environment' claim is actionable under Title VII if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature are so pervasive that it can reasonably be said that they create a hostile or offensive work environment. [Citation.] ... Additionally, Title VII is also violated when an employer affords preferential treatment to female employees who submit to sexual advances or other conduct of a sexual nature and such conduct is a matter of common knowledge." (Id. at p. 1277.)
Finally, in Keenan v. Allan (E.D.Wash. 1995) 889 F.Supp. 1320, the federal district court stated, in a footnote: "`A co-worker's romantic involvement with a supervisor does not by itself create a hostile work environment.' [Citation.] It is only manifestations of the alleged affair, such as sexual horseplay in the office to an egregious and/or frequent degree, or preferential treatment of the co-worker that prevents the plaintiff from being evaluated on grounds other than her sexuality, that are actionable." (Id at p. 1375, fn. 65.) As its sole support, the court in Keenan cited Candelore v. Clark County Sanitation Dist, supra, 975 F.2d at page 590. There, the Circuit Court of Appeals rejected the *67 plaintiffs claim of sexual harassment because she failed to "identify benefits or opportunities denied as a result of discrimination, and because the isolated incidents of inappropriate behavior did not create a hostile or abusive environment...." (Ibid.)
Despite the seemingly broad language in some of the foregoing cases, the legal proposition for which they stand is unremarkable. In Toscano, the court indicated that the typical case of sexual harassment involves a male supervisor, who requests sexual favors from a female employee and conditions a job benefit on her assent. The court explained that the situation presented in the atypical case, i.e., where a job benefit goes to another employee who acquiesced in the supervisor's sexual advances, is "no different in its theoretical underpinnings." (Toscano v. Nimmo, supra, 570 F.Supp. at p. 1199.) The difference is one of proof. In the typical case, the plaintiff proves her case by evidence that she was asked for sexual favors, refused, and was denied a job benefit. In the atypical case, the claim is proven by evidence that another employee acquiesced in the supervisor's sexual advances, and a tangible job benefit went to that employee rather than the plaintiff. Underlying both cases is the message that job benefits are tied to acquiescence in sexual advances.
However, also underlying both cases is an assumption that the plaintiff is treated in this way because of her sex. In other words, a male employee would not have been denied the job benefit for failing to acquiesce in sexual advances. In King, the court explained: "In the typical case involving sexual conduct by a supervisor aimed at a subordinate, the plaintiff alleges that she has been the direct target of sexual propositions, suggestive behavior or similar abuse. Such conduct violates Title VII ... because, but for her gender, a woman would not be subject to such behavior." (King v. Palmer, supra, 598 F.Supp. at p. 66, fn. omitted, italics added.)
The assumption that women employees are treated differently than male employees in the foregoing cases is the fundamental difference between those cases and others that have considered the issue. In Toscano, there was extensive evidence that the supervisor involved had made sexual advances to many female nurses, including the plaintiff, and provided job benefits to the one who acceded to those requests. (Toscano v. Nimmo, supra, 570 F.Supp. at p. 1200.) The supervisor, in fact, described himself as a "life-long `womanizer.' " (Ibid.) In Priest, the supervisor had requested sexual favors from the plaintiff and was rebuffed. (Priest v. Rotary, supra, 634 F.Supp. at p. 581.) In Broderick, the plaintiff was the object of sexual harassment by several supervisors, and there was widespread conduct of bestowing preferential treatment on those who submitted to sexual demands. (Broderick v. Ryder, supra, 685 F.Supp. at p. 1278.)
As the United States Supreme Court noted in Trans World Airlines, Inc. v. Hardison (1977) 432 U.S. 63, 71, 97 S.Ct. 2264, 2270, 53 L.Ed.2d 113, 123, "[t]he emphasis of both the language and the legislative history of [title VII] is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin." To establish a claim, it is therefore necessary to prove a causal connection between the gender of the individual claiming discrimination and the resultant preference or disparity. (See DeCintio v. Westchester County Medical, supra, 807 F.2d at p. 307.) Such causal connection is missing in a case where, without more, preferential treatment is afforded to a supervisor's paramour. Others are not denied the same *68 benefit because of their gender but because they are not the paramour. Hence, males and females are treated equally. (Id. at p. 308.) "Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification." (Taken v. Oklahoma Corp. Com'n, supra, 125 F.3d at p. 1370.)
Plaintiffs contend this matter involves sufficiently egregious behavior to create a hostile work environment based on sex. They point to the following factors: (1) the incidents took place in a paramilitary institution in which relationships with subordinates are strictly prohibited; (2) the highest ranking official of the institution engaged in at least three affairs with subordinates; (3) the affairs were commonly discussed among employees; (4) the warden unfairly promoted the women with whom he was involved; (5) those women were promoted more quickly than others; (6) the affairs made other women feel "disgusting, awful and very angry"; (7) other women perceived they would have to submit to the sexual desires of their supervisors to survive; (8) plaintiffs were mistreated for reporting the affairs; and (9) plaintiffs were threatened, even after they ceased working for CDC.
We fail to see the significance of plaintiffs' first factor. The fact that plaintiffs worked in a paramilitary institution where relationships with subordinates is strictly prohibited would appear to weigh against their claim. One would think that working in an institution where such conduct is tolerated rather than prohibited would be of greater concern. As to the fact plaintiffs were mistreated after reporting the affairs, this shall be considered in connection with plaintiffs' retaliation claims. The remaining factors boil down to this: The warden engaged in affairs with at least three subordinate female employees, and those employees received preferential treatment at work. The affairs were commonly known within the institution and made other subordinate female employees feel "disgusting, awful and very angry" and made them believe they would have to sleep with their supervisors in order to get ahead.
In DeCintio v. Westchester County Medical, supra, 807 F.2d 304, the court explained that, in order to establish a sexual harassment claim based on an affair between a supervisor and a coworker, the plaintiff must prove the affair was not consensual. (Id. 307-308.) The court discussed an EEOC guideline, relied on by plaintiffs here, providing that, where employment benefits are granted because of submission to an employer's sexual advances, the employer may be liable to other employees who were denied the benefits. The court indicated that submission, as used in this guideline, "involves a lack of consent and implies a necessary element of coercion or harassment." (Ibid, italics omitted.) The court continued: "[T]he EEOC has indicated that sexual relationships between coworkers should not be subject to Title VII scrutiny, so long as they are personal, social relationships." (Id. at p. 308; accord, Erickson v. Marsh & McLennan Co. (1990) 117 N.J. 539, 569 A.2d 793, 801-803.)
In Drinkwater v. Union Carbide Corp., supra, 904 F.2d at page 861, the court indicated that, "in hostile environment cases, it is the environment, not the relationship, that is actionable. The relationship may contribute to the environment, but it is the workplace atmosphere that is critical." There, the court rejected the plaintiffs hostile work environment claim because she failed to show the relationship at issue rendered the workplace a "sexually charged environment." (Id at p. 862.) According to the court: "Such an atmosphere might have discriminated against *69 plaintiff if sexual discourse displaced standard business procedure in a way that prevented plaintiff from working in an environment in which she could be evaluated on grounds other than her sexuality." (Ibid.) In that case, there was no evidence that the parties who engaged in the relationship flaunted it or that such relationships were prevalent at the workplace. (Ibid.)
There is no evidence in the present matter that Kuykendall's relationships with Bibb, Patrick or Brown were other than consensual. In her deposition, Miller testified that Patrick professed to be in love with Kuykendall. Nor is there evidence that Kuykendall flaunted any of these relationships, or attempted to use them to gain advantage over other female employees. Although plaintiffs cite the fact Kuykendall was seen dancing with Patrick at an office function, this hardly qualifies as flaunting.
There is evidence in the record suggesting that Bibb and Brown bragged about their influence over Kuykendall. However, this is not flaunting of the sexual relationships, but flaunting of the power flowing from those relationships. There is no evidence of discussions in the workplace of a sexual nature or other indiscrete behavior. Nor is there evidence of a prevalence of supervisor-subordinate relationships in the workplace. All three relationships involved the same supervisor over a relatively short period of time.
As indicated previously, a plaintiff claiming hostile work environment sexual harassment must prove the harassment was sufficiently pervasive to alter the conditions of employment. (See Fisher v. San Pedro Peninsula Hospital, supra, 214 Cal. App.3d at p. 608, 262 Cal.Rptr. 842.) "The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended." (Id. at pp. 609-610, 262 Cal.Rptr. 842, fn. omitted.) Although tangible job detriment is not necessary, the absence of such detriment requires a higher showing of harassment. (Id. at p. 610, 262 Cal.Rptr. 842.) "[T]he plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." (Ibid.)
Ignoring for the moment evidence of retaliation for threatened, or actual, reporting of the relationships, plaintiffs have demonstrated unfair conduct in the workplace by virtue of Kuykendall's preferential treatment of his various paramours. However, beyond the fact of those relationships and the preferential treatment, plaintiffs have not shown a concerted pattern of harassment sufficiently pervasive to have altered the conditions of their employment on the basis of sex. Plaintiffs were not themselves subjected to sexual advances, and were not treated any differently than male employees at VSPW. Hence, the trial court correctly concluded there is no evidentiary basis for plaintiffs' various sex discrimination and harassment claims.

III

Retaliation
Government Code section 12940, subdivision (h), makes it an unlawful employment practice "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part...." To establish a prima facie claim of retaliation under the FEHA, "the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's *70 action." (Flait v. North American Watch Corp. (1992) 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d 522.)
Plaintiffs contend they engaged in protected activity when they complained about what they perceived to be a hostile work environment based on sex. Miller contends she also engaged in protected activity by seeking a reasonable accommodation for her sarcoidosis. Regarding adverse action, Miller points to loss of promotions, ostracism, being demeaned and labeled a snitch, denial of disability accommodations, being undermined at work, being stripped of responsibilities, being required to meet unreasonable and impossible work demands, being pressured out of reporting misconduct, and being threatened even after she left CDC. Mackey points to the loss of a promotion, loss of inmate pay, ostracism, being demeaned, being assigned as an office assistant and later a comanager, being called useless, being pressured out of reporting misconduct, and being threatened after leaving CDC. Finally, plaintiffs contend a causal nexus is established by the timing of the adverse action and evidence that the individuals involved were aware plaintiffs had complained about misconduct.
The trial court granted summary adjudication on plaintiffs' retaliation claims, based on its rulings on the discrimination claims. The court concluded that plaintiffs did not engage in protected activity by reporting what was not, in fact, sex discrimination.
Plaintiffs contend the trial court applied the wrong standard. They argue the question of whether they engaged in protected activity does not turn on whether they reported unlawful activity but whether they reasonably believed they were reporting unlawful activity. We agree. A meritorious retaliation claim may lie even where the underlying discrimination claim fails. (Sanchez v. Denver Public Schools (10th Cir.1998) 164 F.3d 527, 533.) "An employer may not `fire an employee because he opposed discrimination against a fellow employee, even if he was mistaken and there was no discrimination. The mistake must, of course, be a sincere one; and presumably it must be reasonable ... for it seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them. But it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.' (Rucker v. Higher Educational Aids Bd. (7th Cir.1982) 669 F.2d 1179, 1182.)" (Flait v. North American Watch Corp., supra, 3 Cal.App.4th at p. 477, 4 Cal.Rptr.2d 522.)
Nevertheless, we agree with the trial court that plaintiffs did not engage in protected activity. To be protected, plaintiffs must reasonably believe they were reporting conduct prohibited by the FEHA. (Gov.Code, § 12940, subd. (h).) Here, plaintiffs made a number of complaints to Kuykendall and others within the CDC hierarchy about what was happening at VSPW. They also reported the affairs, and Brown's abusive conduct, to the OLA. However, none of those complaints arguably concerned sexual harassment, or discrimination, within the meaning of the FEHA.
For example, plaintiffs cite evidence that Miller complained to Kuykendall that Brown and Yamamoto forced her to attend the audit three hours away from the prison. Plaintiffs also cite evidence that, while at the audit, Miller informed Gerald Harris, a chief deputy warden, about the relationships between Brown and Kuykendall and between Brown and Yamamoto and that Brown and Yamamoto had formed an *71 alliance against Miller that Kuykendall refused to correct. There is no suggestion in any of this evidence that Miller was complaining about sexual harassment of herself.
Plaintiffs also rely on notes from their interviews in the OIA investigation. In one interview, Mackey reported the twohour confrontation between Miller and Brown in which Miller was assaulted. Mackey stated she reported the matter to Kuykendall. Mackey also reported the telephone conversation between Brown and Miller that preceded the assault. According to Mackey, at one point Brown expressed the opinion that Yamamoto "is the meanest person she has come across...." Miller reported to OIA that Brown denied being sexually interested in Yamamoto but that Brown felt trapped in a triangle with Yamamoto and Kuykendall because Yamamoto knew about the relationship between Brown and Kuykendall. Miller also reported that Brown told her Yamamoto was "constantly" at Brown's house. Miller reported that she allowed others to eavesdrop on her telephone conversation with Brown to obtain evidence, because she intended to report the affair between Brown and Kuykendall. Miller also informed OIA that Brown was having an affair with another coworker, and Kuykendall was not happy about it.
None of this evidence amounts to a report of sexual harassment directed at plaintiffs, either expressly or impliedly. Neither Miller nor Mackey complained that the affairs and related conduct created an atmosphere whereby they felt they were being judged on their sexuality rather than on merit. Neither woman claimed to have been propositioned by a supervisor, expressly or impliedly, or to have been the subject of unwanted sexual attention. Neither woman claimed that the atmosphere had become so sexually charged that they could no longer do their work. Rather, plaintiffs' complaints and reports concerned the unfairness of promotions and other benefits given to paramours and the resulting mistreatment of them by those paramours. Plaintiffs were not complaining about sexual harassment but unfairness. This is not protected activity under the FEHA.
Mackey cites a memorandum addressed to Terhune, in which she indicates that, in her 22 years with CDC, she has "never seen such a [Peyton P]lace as Valley [S]tate Prison for Women." In the memorandum, Mackey recounted what had been happening at the prison and the various affairs that had existed. However, in her declaration, Mackey stated she never sent this memorandum to Terhune.
Miller cites a memorandum that she sent to Richard Ehle in August 1998, in which she complained about being retaliated against and ostracized following the OIA investigation. However, this memorandum is not a report of sexual harassment but a report of retaliation for testifying. Miller is attempting to bootstrap a retaliation claim with evidence of retaliation for reporting retaliation, without presenting evidence that the original retaliation was based on protected activity.
As indicated previously, a claim of sexual harassment based on relationships between supervisors and subordinates must be based on the creation of a hostile work environment. "[I]n hostile environment cases, it is the environment, not the relationship, that is actionable." (Drinkwater v. Union Carbide Corp., supra, 904 F.2d at p. 861.) "Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual *72 abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets." (Henson v. City of Dundee (11th Cir.1982) 682 F.2d 897, 902.)
Plaintiffs' complaints to superiors concerned the existence of sexual relationships and retaliation for threatened, or actual, reporting of those relationships. Plaintiffs complained that they were being forced to work in an atmosphere where paramours were given preferential treatment and abused those who objected. However, they did not complain that they were being forced to work in an atmosphere where they had to run a gauntlet of sexual abuse or where they were judged on their sexuality rather than on the merits. This is not a situation where plaintiffs honestly, but mistakenly, believed they were engaging in protected activity by reporting sexual harassment. Plaintiffs did not even attempt to report sexual harassment. They were reporting what they perceived to be the unfairness of the situation. However justified plaintiffs' position may have been, it did not concern activity protected by the FEHA. The trial court correctly granted summary adjudication on plaintiffs' retaliation claims.
As to Miller's claim of retaliation for requesting an accommodation for her medical condition, there is no evidence of retaliation based on this request. Miller was given an accommodation in being assigned to facility B and, perhaps, in being allowed to use a handicap parking space. These benefits were taken away after Miller provided testimony in the OIA investigation. However, there is no suggestion these accommodations were taken away because Miller asked for an accommodation, rather than because of her testimony. There was no additional deprivation of benefits after Miller requested an accommodation.

IV-VI[***]

Disposition
The judgment is affirmed.
We concur: RAYE, Acting P.J., and CALLAHAN, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, IV, V and VI.
[**] See footnote *, ante.
[***] See footnote *, ante.